# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 11, 2022         Decided July 26, 2022

No. 18-3041

UNITED STATES OF AMERICA,
APPELLEE

v.

AHMED SALIMFARAJ ABUKHATALLAH, ALSO KNOWN AS
AHMED MUKATALLAH, ALSO KNOWN AS AHMED ABU
KHATALLAH, ALSO KNOWN AS AHMED BUKATALLAH, ALSO
KNOWN AS SHEIK,
APPELLANT

———

Consolidated with 18-3054

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:14-cr-00141-1)

———

*Julia Fong Sheketoff*, Assistant Federal Public Defender, argued the cause for appellant/cross-appellee. With her on the briefs was *A. J. Kramer*, Federal Public Defender. *Mary M. Petras*, Assistant Federal Public Defender, entered an appearance.

*Daniel J. Lenerz*, Assistant U.S. Attorney, argued the cause for appellee/cross-appellant. With him on the briefs were *Elizabeth Trosman*, Assistant U.S. Attorney at the time the brief was filed, and *Elizabeth H. Danello* and *John Crabb Jr.*, Assistant U.S. Attorneys. *Chrisellen R. Kolb*, Assistant U.S. Attorney, entered an appearance.

Before: MILLETT, KATSAS, and RAO, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

Concurring Opinion filed by *Circuit Judge* MILLETT.

PER CURIAM: Ahmed Abu Khatallah ("Khatallah") was convicted on several counts related to his involvement in the September 11, 2012, terrorist attack on the United States' diplomatic outpost in Benghazi, Libya. He was sentenced to 22 years of imprisonment and five years of supervised release. He now appeals his convictions under several theories, seeking acquittal or at least a new trial. The government has cross-appealed, arguing the district court's 22-year sentence is substantively unreasonably low. We hold for the government. Khatallah has failed to show that he was convicted on legally insufficient evidence, that he was prejudiced by any erroneous evidentiary rulings or jury instructions, or that he was substantially prejudiced by the prosecution's closing arguments. On the other hand, Khatallah's sentence is substantively unreasonably low in light of the gravity of his crimes of terrorism. The district court's decision to disregard conduct for which Khatallah was acquitted cannot account for its dramatic downward departure from the Sentencing Guidelines' recommendation. We therefore reverse his sentence and remand for resentencing.

**I**

**A**

In 2011, after the fall of Muammar Gaddafi's regime, the United States established a diplomatic outpost, the United States Special Mission ("the Mission"), in the city of Benghazi "to maintain a diplomatic relationship with those in eastern Libya and to support the people of Libya in rebuilding their war-torn country." Government's Supplemental Appendix ("S.A.") 84. "The Mission was typically occupied by a small contingent of [State Department] personnel and members of a local guard force, who were employed by [the State Department]." S.A. 84. The CIA also established a covert facility ("the Annex") about a mile away. During the events relevant here, the U.S. Ambassador to Libya, J. Christopher Stevens, was temporarily staying at the Mission.

On the night of September 11, 2012, dozens of terrorists assaulted the Mission under cover of darkness. Around 9:45 p.m., the heavily armed militants assembled and forced their way through the Mission's main gate. They opened fire on the American and allied security personnel stationed there. They bashed and poured gasoline on Mission vehicles. And the militants set fire to the "Villa," the main residential facility in the Mission, which was occupied by Ambassador Stevens and Sean Patrick Smith, a State Department Foreign Service officer. After initially seeking refuge in a safe room, both men died from smoke inhalation while trying to escape the Villa. U.S. and allied forces counterattacked, and by around 10:15 p.m., this first wave of the attack had been repulsed.

The second wave began around 11:15 p.m., when the militants returned to the Mission at another gate and attacked the American allies still on the premises using AK-47s and rocket-propelled grenades. The remaining Americans on site

quickly evacuated the facility and made a perilous drive to the Annex. The militants gained entry around 11:45 p.m. and ransacked the Mission, lighting vehicles on fire and taking sensitive information from the Mission's Tactical Operations Center. Their work at the Mission done, the militants attacked the Annex around 12:30 a.m. on September 12 and then retreated after two violent skirmishes. Around 5:15 a.m., they resumed their attack with mortar fire that killed two more Americans, security officers Tyrone Woods and Glen Doherty, and injured two others. U.S. reinforcements eventually arrived and evacuated the U.S. personnel in the Annex to safety in Tripoli.

Ambassador Stevens' death shocked the American public. As the district court remarked at sentencing, "it was the first time in 40 years that a United States ambassador had been killed in the line of duty." Sentencing Tr. 50 (June 27, 2018). In response, the U.S. government deployed substantial resources to find and punish those responsible. These efforts led to Khatallah's 2014 capture.

Khatallah is a 51-year-old Benghazi native. He was imprisoned by the Gaddafi regime—allegedly for his religious beliefs. At some point after his release from custody, Khatallah became the leader of "Ubaydah Bin Jarrah" ("UBJ"), an Islamist militia active in the Benghazi area. UBJ was one of many local "brigades" that formed a coalition against the Gaddafi regime in the Libyan Civil War but afterward continued to operate independently of the recognized successor government. Testimony at trial linked UBJ to Ansar al-Sharia,

a notorious Al-Qaeda affiliated organization whose camp served as a base of operations for the Benghazi attack.[1]

Khatallah was captured pursuant to a joint operation among multiple U.S. agencies. The government principally relied on the cooperation of Ali Majrisi, a wealthy Benghazi-based businessman who befriended Khatallah at the United States' urging.[2] Majrisi approached Khatallah with an offer of financing and convinced him to go to a purported "safe house" on the coast. In fact, U.S. forces were waiting to arrest Khatallah. He was subdued and disarmed upon entering the building, and U.S. forces loaded him onto a Navy vessel for transport to the United States. American officials also interrogated Khatallah about the attack en route.

**B**

Khatallah was indicted on 18 counts. Count 1 was for "conspiracy to provide material support and resources to terrorists resulting in death." Appellant's Appendix ("App.") 2–8; *see* 18 U.S.C. § 2339A. Count 2 was for "providing material support and resources to terrorists resulting in death." App. 8–9; *see* 18 U.S.C. § 2339A. Counts 3–15 were for the murders, attempted murders, and killings by fire or explosives of Ambassador Stevens and the three other Americans. App.

---

[1] The parties dispute the proper way to characterize UBJ. The government describes UBJ as "comprised of Islamist extremists who refused to operate under the authority of the post-revolution government in Benghazi," Gov't Opening Br. 7, and there is testimony supporting this characterization. Khatallah emphasizes that at one point UBJ was working with the United States and received some indirect protection from the United States.

[2] Like other witnesses, including Bilal al-Ubydi, Majrisi used a pseudonym for his safety and that of his family.

9–17. Counts 16 and 17 were for "maliciously destroying and injuring dwellings and property and placing lives in jeopardy within the special maritime and territorial jurisdiction of the United States and attempting to do the same" in violation of 18 U.S.C. § 1363. App. 17–18; *see* 18 U.S.C. § 7 (defining the "special maritime and territorial jurisdiction of the United States"). Count 16 was for the destruction of the Mission buildings and property, while Count 17 was for the damage to the Annex. And Count 18 was for "using, carrying, brandishing, and discharging a firearm during a crime of violence" in violation of 18 U.S.C. § 924(c). App. 18–19.

At trial, after presenting testimony about the nature of the attack and the deaths of the four Americans, the government presented a series of witnesses to tie Khatallah to the attack on the Mission. *See United States v. Khatallah* ("*Khatallah IV*"), 313 F. Supp. 3d 176, 182–85 (D.D.C. 2018) (summarizing the evidence presented at trial).

First, the government called Khalid Abdullah, a Libyan army commander. He claimed Khatallah told him he resented the presence of American intelligence personnel in the country and that he was planning to attack the consulate. Although Abdullah was a part of the U.S.-friendly army, he testified that Khatallah warned him not to interfere with the attack and asked for military equipment and vehicles. *Khatallah IV*, 313 F. Supp. 3d at 182–83.

Second, the government called Bilal al-Ubydi, who grew up with Khatallah and was a local leader of the militia groups friendly to the United States. *Khatallah IV*, 313 F. Supp. 3d at 183. Al-Ubydi testified that Khatallah was UBJ's commander and religious leader. While viewing surveillance footage in court, al-Ubydi identified several people carrying assault rifles during the first wave of the attack as UBJ members and close

associates of Khatallah. Al-Ubydi further testified that Khatallah called him around 10:15 p.m. the night of the attack and told him—in a manner al-Ubydi perceived as hostile and threatening—to "pull back" a group of guards stationed near the Mission. Trial Tr. 2533 (Oct. 18, 2017, AM). Finally, in Mission surveillance footage timestamped 11:55 p.m., al-Ubydi identified Khatallah as a figure holding an assault rifle and surrounded by other attackers including the local commander of Ansar al-Sharia.

Third, the government called the agents who captured Khatallah and interrogated him on his way to the United States. *Khatallah IV*, 313 F. Supp. 3d at 184. They testified that during the interrogation, Khatallah identified people from the surveillance footage of the Benghazi attack. According to one of the agents, Khatallah also admitted to manning a roadblock and turning away U.S.-friendly forces, to driving to the compound after the attack began with a gun, and to entering a Mission building.

Finally, the government called Ali Majrisi, the local businessman who helped capture Khatallah. He testified that Khatallah knew he was suspected of involvement in the attack and that Khatallah expressed disappointment that more Americans had not been killed. *Khatallah IV*, 313 F. Supp. 3d at 183. Majrisi also testified that Khatallah essentially admitted involvement in the attack by referring to "when we were attacking the compound" and stating that he "intended then to kill everybody" associated with the Mission. Trial Tr. 4995 (Nov. 6, 2017, PM).

The government also relied heavily on spreadsheets it claimed were records of Khatallah's phone calls. *Khatallah IV*, 313 F. Supp. 3d at 183–84. A witness from Libyana Mobile Phone testified that the documents appeared to be Libyana

forms. Witnesses also matched the numbers on the spreadsheet to phone numbers belonging to UBJ members. The government used this testimony, in concert with video footage showing UBJ members speaking on the phone during the attack, to show both that the records were authentic and that Khatallah was in touch with UBJ members on site during the first wave of the attack.

Khatallah's first main witness was a friend, Ahmed Salem, who claimed Khatallah was at his house the evening of the attack and that when Khatallah was called and told about the attack he was surprised to hear there was a U.S. diplomatic facility in Benghazi. *Khatallah IV*, 313 F. Supp. 3d at 184. His other main witness was Abdul Basit Igtet, who testified that Khatallah was eager to speak with the United States before he was captured. *Id.* Beyond that, because of national security concerns that limited the evidence he could bring, Khatallah had to rely on stipulations read to the jury to bolster his defense. "Most of the stipulations described information in the government's possession concerning other possible perpetrators of the attack," while other stipulations conveyed the compensation provided to the government's cooperating witnesses. *Id.* A final stipulation reported that the cell phone registered to Khatallah's phone number was in his house three miles from the Annex during most of the attack on the Annex. *Id.* at 184–85.

After a seven-week trial, the jury found Khatallah guilty on four counts. It convicted on Counts 1 and 2 for conspiring to provide material support to terrorists and providing that support. It convicted on Count 16 for injuring a building, "that is, the U.S. Special Mission," within the U.S. "special maritime and territorial jurisdiction." App. 165. And it convicted on Count 18 for carrying a semi-automatic weapon during a crime of violence. For Counts 1 and 2, the jury made special findings

that Khatallah was not guilty of conduct "resulting in death." App. 163. And Khatallah was acquitted of Counts 3–15 and Count 17. Thus, Khatallah was acquitted of all murder and related homicide charges and for any liability directly involving the Annex. *See Khatallah IV*, 313 F. Supp. 3d at 186.

During trial, Khatallah had moved for a judgment of acquittal after the government rested, and he renewed it after he presented his case. *United States v. Khatallah* ("*Khatallah VI*"), 316 F. Supp. 3d 207, 210 (D.D.C. 2018). The court reserved consideration of the motion and allowed the jury to decide. *Id.* After the jury delivered its verdict, Khatallah renewed his acquittal motion with respect to his conviction for carrying a semi-automatic firearm during a crime of violence (Count 18). *Id.* But the district court denied the motion on the ground that a conviction under Section 1363 for damaging property necessarily involved "the use, attempted use, or threatened use of physical force against the … property of another" as required for Count 18. *Id.* at 213 (quoting 18 U.S.C. § 924(c)(3)(A)).

Before and after the jury delivered its verdict, Khatallah also moved for a mistrial on the basis of the prosecution's closing arguments. He claimed the prosecutor's references to matters outside the record, her denigration of the defense's stipulations, and her emotive appeals to patriotism deprived him of due process. While agreeing some of the prosecutor's behavior was outside the bounds of acceptable advocacy, the court denied the motion on the ground that Khatallah failed to show he was prejudiced. *Khatallah IV*, 313 F. Supp. 3d at 185–86, 190–96.

At sentencing, the court calculated Khatallah's Guidelines-recommended sentence as life plus ten years. *United States v. Khatallah* ("*Khatallah V*"), 314 F. Supp. 3d

179, 202–03 (D.D.C. 2018). Nonetheless, the court varied downward from that calculation to impose a 22-year sentence—a 12-year sentence for Counts 1, 2, and 16, and a statutorily mandated consecutive ten-year sentence for Count 18.

Khatallah appealed, and the government cross-appealed Khatallah's sentence.

## II

At trial, the government introduced records of telephone calls purportedly made and received by Khatallah around the time of and during the attack on the Mission. Those records were obtained from Libyana Mobile Phone. Khatallah argues that the records were erroneously admitted into evidence because they were not authenticated before the jury.

We review the district court's decision to admit the records into evidence for an abuse of discretion. *United States v. Lawson*, 494 F.3d 1046, 1052 (D.C. Cir. 2007).

Generally speaking, documents offered to prove the truth of their content—here, to show that Khatallah communicated with certain persons at certain times—are inadmissible hearsay. *See* FED. R. EVID. 801, 802. But "[a] record of an act[] [or] event" is admissible notwithstanding the rule against hearsay if it (1) "was made at or near the time by … someone with knowledge[,]" (2) "was kept in the course of a regularly conducted activity of a business," (3) was made as part of "a regular practice of that activity[,]" and (4) "the opponent" of its admission "does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." *Id.* 803(6). "[A]ll these conditions" may be

"shown by … a certification that complies with … a statute permitting certification[.]" *Id.* 803(6)(D).

Congress has enacted a certification statute specifically to govern the admission of "a foreign record of regularly conducted activity," like the telephone records here. 18 U.S.C. § 3505(a)(1). "In a criminal proceeding[,]" such a record "shall not be excluded as evidence by the hearsay rule if a foreign certification attests" to conditions similar to those specified by Federal Rule of Evidence 803(6): That is, that the record (1) "was made, at or near the time of the occurrence of the matters set forth, by … a person with knowledge of those matters[,]" (2) "was kept in the course of a regularly conducted business activity[,]" (3) was made "as a regular practice" of "the business activity[,]" and (4) is either an original or "a duplicate of the original[.]" *Id.* § 3505(a)(1), (a)(1)(A)–(D).

Another "condition precedent to admissibility" is authentication. *United States v. Rembert*, 863 F.2d 1023, 1026 (D.C. Cir. 1988) (internal quotation marks omitted). Ordinarily, to authenticate a proffered item, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." FED. R. EVID. 901(a). Under Section 3505, Congress directed that the foreign certification itself "shall authenticate such record or duplicate" of the record as long as the district court finds "trustworth[y]" the "source of information or the method or circumstances of [the document's] preparation." 18 U.S.C. § 3505(a)(1)–(2).

Consistent with Section 3505, the government moved prior to trial for an order authenticating and admitting into evidence the Libyana telephone records. The district court granted that motion, crediting the foreign certification of the Libyana records by Mohammed Ben Ayad, the Chief Executive Officer of Libyana. *United States v. Khatallah*, 278

F. Supp. 3d 1, 6 (D.D.C. 2017). Ben Ayad attested that the telephone records satisfied Section 3505's four conditions of admissibility. S.A. 8.

In finding that the telephone records satisfied Section 3505's requirements for admissibility, the district court provided that the admissibility of testimony about the records was "subject to the Government later establishing [the records'] relevance as Mr. Khatallah's phone records." Trial Tr. 2597 (Oct. 18, 2017, PM); *see* FED. R. EVID. 104(b).

Khatallah does not challenge the district court's pretrial ruling deeming the records admissible under Section 3505. Instead, he contends that the government failed subsequently to authenticate the telephone records before the jury. That argument fails because, by connecting the records to Khatallah as the district court required, the government simultaneously "produce[d]" for the jury "evidence sufficient to support a finding" that the records were authentic, consistent with Federal Rule of Evidence 901(a).

First, "[t]he appearance, contents, substance, internal patterns, [and] other distinctive characteristics" of the records supported the inference that they were genuinely Libyana phone records documenting Khatallah's calls. FED. R. EVID. 901(b)(4). The records consisted of a table with fields labeled, in Arabic, "time of call," "duration of call," "number of receiver," and "number of caller." App. 839 (records' first page); App. 504–06. The table also had technical headings indicating the cell tower used for each call. App. 839.

Second, a Libyana security guard who had previously obtained information from Libyana's computer system for the FBI testified that the records were in the "[s]ame format" as Libyana call records he had seen. Trial Tr. 4808 (Nov. 2, 2017, PM); *id.* at 4815. He observed that the phone number attributed

to Khatallah began with the number 92, a Libyana prefix, and that "all the numbers" were preceded by Libya's country code, 218. *Id.* at 4808–09. The records also contained a colorized page that, according to the guard, bore the same purple hue as other Libyana records. *Id.* at 4812. This purple coloring was consistent with photographs taken of Libyana subscriber records. S.A. 116–21. The guard confirmed that the records were "for sure" Libyana records. Trial Tr. 4892 (Nov. 6, 2017, AM).

Third, Ali Majrisi, the Benghazi businessman recruited by the United States to help apprehend Khatallah, testified that the subscriber indicated in the records was Khatallah's brother and that the address listed was Khatallah's. Trial Tr. 4979–80 (Nov. 6, 2017, PM). Additionally, multiple witnesses testified that phone numbers in the spreadsheet belonged to associates of Khatallah. *See, e.g.*, Trial Tr. 2608 (Oct. 18, 2017, PM); Trial Tr. 3887 (Oct. 30, 2017, AM); Trial Tr. 4810–11 (Nov. 2, 2017, PM); *id.* at 4812.

Fourth, witness testimony corroborated that certain calls documented in the records actually were made by or to Khatallah. Special Agent Michael Clarke testified that Khatallah told him he "may have" called Salah al-Amari after receiving a call from Jamaica—both UBJ members—between 8:30 and 9:00 p.m. on the evening of the attack. Trial Tr. 3874 (Oct. 30, 2017, AM); *see id.* at 3867. The records indicate a call from Khatallah to al-Amari at 8:39 p.m. *Id.* at 3878–79; App. 868. Similarly, Bilal al-Ubydi testified that Khatallah called him around 10:15 p.m. that same evening. Trial Tr. 2531–33 (Oct. 18, 2017, AM). A call from Khatallah to al-Ubydi at 10:20 p.m. appears in the records. Trial Tr. 2609–10 (Oct. 18, 2017, PM); App. 868.

Khatallah objects that there were many reasons for a jury to discredit the government's authenticating evidence. For example, he argues that while the records' "headings are *consistent* with what one might expect to see on genuine and accurate foreign call records, they hardly help to *prove* that the spreadsheet actually comprised such records." Khatallah Reply Br. 8 (emphasis in original). He also notes that while Agent Clarke reported that al-Ubydi told him that he and Khatallah spoke for "over ten minutes" on the night of the attack, the corresponding entry in the records indicates the call lasted just 36 seconds. Khatallah Opening Br. 15; *compare* Trial Tr. 5584–85 (Nov. 13, 2017, PM), *with* App. 868.

To be sure, Khatallah had grounds for challenging the government's showing and arguing to the jury that they should not credit the telephone records—and he did so. *See, e.g.*, Trial Tr. 6093 (Nov. 16, 2017, PM) (defense counsel arguing in closing that "there's absolutely no[] foundation for you to believe that … what they keep calling phone records are, in fact, phone records"). But in deciding the telephone records' admissibility, the question is not whether the government conclusively proved their authenticity. It is only whether the government's showing "permit[ted] a reasonable juror to find that the evidence is what its proponent claims." *United States v. Blackwell*, 694 F.2d 1325, 1330 (D.C. Cir. 1982) (citation omitted). The government's evidentiary showing was sufficient to that task. And with Rule 901's requirements met, Khatallah's arguments "go to the *weight* of the evidence—not to its *admissibility*." *United States v. Tin Yat Chin*, 371 F.3d 31, 38 (2d Cir. 2004) (emphases in original); *see also United States v. Mitchell*, 816 F.3d 865, 871–72 (D.C. Cir. 2016); 31 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE EVIDENCE § 7104 (2d ed. April 2022 update) ("[T]he jury retains the power to determine what

weight to give evidence in light of any questions concerning its authenticity.").[3]

## III

Khatallah challenges his conviction on Count 16 for "maliciously destroying and injuring dwellings and property, that is the U.S. Special Mission, and placing lives in jeopardy within the special maritime and territorial jurisdiction of the United States and attempting to do the same." App. 165. He maintains that the evidence was legally insufficient to demonstrate that his actions fell within the special maritime and territorial jurisdiction of the United States ("the special jurisdiction") or alternatively that the conviction should be vacated because the jury was wrongly instructed regarding this jurisdictional element. We decline to set aside this conviction on either ground.

## A

Khatallah was convicted under 18 U.S.C. § 1363, which criminalizes the malicious destruction of buildings and property "within the special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 1363.[4] The jury

---

[3] Because the government introduced sufficient evidence to permit a rational jury to conclude that the records were authentic, we need not decide whether the district court's pretrial authentication ruling under 18 U.S.C. § 3505 made authentication before the jury unnecessary. *See* Gov't Opening Br. 22–29.

[4] Section 1363 provides in full that, "[w]hoever, within the special maritime and territorial jurisdiction of the United States, willfully and maliciously destroys or injures any structure, conveyance, or other real or personal property, or attempts or conspires to do such an act, shall be fined under this title or

also convicted him of the aggravating factor that applies "if the building be a dwelling, or the life of any person be placed in jeopardy." *Id.*; *see* App. 165.

To bring Khatallah's offense within the special jurisdiction, the government relied only on the diplomatic premises definition of the special jurisdiction. 18 U.S.C. § 7(9). This definition applies to "offenses committed by or against a national of the United States" on the premises of U.S. diplomatic facilities abroad, including "United States Government Missions … in foreign States." *Id.* § 7(9), 7(9)(A). The government maintains that this definition applies because the destruction of property was "committed … against a national of the United States" on the premises of the Mission. Khatallah argues he is entitled to acquittal on Count 16 because there was legally insufficient evidence that his actions satisfied the diplomatic premises definition of the United States' special jurisdiction.

Khatallah's challenge "faces a high threshold." *United States v. Tucker*, 12 F.4th 804, 826 (D.C. Cir. 2021) (per curiam) (cleaned up). The question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (cleaned up). Because the question is what "*any* rational trier of fact" could have found, our determination "does not rest on how the jury was instructed." *Musacchio v. United States*, 577 U.S. 237, 243 (2016).

---

imprisoned not more than five years, or both, and if the building be a dwelling, or the life of any person be placed in jeopardy, shall be fined under this title or imprisoned not more than twenty years, or both."

To meet this high bar, Khatallah makes a purely legal argument that no Section 1363 conviction can rest on the diplomatic premises definition of the special jurisdiction regardless of the evidence in the case because of the intersecting elements of that definition and Section 1363.

The diplomatic premises definition of the special jurisdiction has two parts as relevant here: (1) the crime has to take place on the premises of a diplomatic or military facility, and (2) it has to be an "offense[] committed by or against a national of the United States." 18 U.S.C. § 7(9)(A), 7(9). Khatallah does not dispute that the attack occurred at a diplomatic mission, but he argues a violation of Section 1363 can never be an offense committed "against a national of the United States." He invokes the traditional distinction between crimes against the person and crimes against property. *Cf. Borden v. United States*, 141 S. Ct. 1817, 1839–40 (2021) (Kavanaugh, J., dissenting). Section 1363, he says, is "essentially a property crime" because it requires the "willful[] and malicious[] destruction" of a structure or property. 18 U.S.C. § 1363. The destruction of property cannot be a crime "against" an American national or any person, Khatallah insists, regardless of the circumstances or effects of the crime. Because Section 1363 is never a crime against an American person, Khatallah argues its special jurisdiction element can never be satisfied by the diplomatic premises definition, which applies only to offenses against persons, namely U.S. nationals.[5] Therefore, because the jurisdictional element of

---

[5] This is not the first time Khatallah has made this argument: the district court rejected it in an opinion denying a motion to dismiss that count of the indictment before trial. *United States v. Khatallah*, 168 F. Supp. 3d 210, 213–15 (D.D.C. 2016).

Count 16 cannot be satisfied by the charged category of special jurisdiction, Khatallah claims he is entitled to an acquittal.

Section 1363 does not just define a property crime. Some violations of Section 1363 may be exclusively property crimes. *See, e.g.*, *United States v. Grady*, 18 F.4th 1275, 1281–83 (11th Cir. 2021) (affirming a conviction under Section 1363 for a peaceful protest that involved spray painting naval facilities). But Section 1363 also creates an enhanced offense that can be committed by destroying property in a way that places a life in jeopardy. 18 U.S.C. § 1363 (enhancing the maximum penalty "if … the life of any person be placed in jeopardy"). These violations of Section 1363 are not just property crimes. When placing a person in jeopardy is an element of the offense, that offense is committed against the person threatened.[6] We thus agree with the district court that when an American life is the one placed in jeopardy as required for the statutory enhancement, the malicious destruction of property in violation of Section 1363 is an "offense committed … against a national of the United States" and can occur within the special jurisdiction's diplomatic premises definition. *See United States v. Khatallah*, 168 F. Supp. 3d 210, 213 (D.D.C. 2016).

Because Khatallah's purely legal argument cannot succeed, there is no basis for a judgment of acquittal on appeal. On the facts here, a rational trier of fact could have found beyond a reasonable doubt that Khatallah violated Section 1363 in a way that placed an American's life in

---

[6] Because it is sufficient that placing an American life in jeopardy is an offense committed against an American, we need not address whether someone can violate Section 1363 within the special jurisdiction by injuring an American's dwelling. *See* 18 U.S.C. § 1363 (enhancing the maximum permissible sentence "if the building be a dwelling").

jeopardy. Khatallah's co-conspirators perpetrated a violent attack on Americans while damaging U.S. property, so a rational jury could have convicted Khatallah as vicariously liable for their actions. "[A] conspirator can be found guilty of a substantive offense based upon acts of his coconspirator so long as the act was done in furtherance of the conspiracy, was within the scope of the unlawful project, and could be reasonably foreseen as a necessary or natural consequence of the unlawful agreement." *United States v. Sampol*, 636 F.2d 621, 676 (D.C. Cir. 1980) (per curiam) (citing *Pinkerton v. United States*, 328 U.S. 640 (1946)).

Here videos showed that UBJ members Aymen al-Dijawi, Jamaica, and Zakaria Barghathi "stormed a secure government compound with guns, entered Mission buildings while armed, and spread gasoline on vehicles located at the Mission," all while Americans were still present. *See Khatallah V*, 314 F. Supp. 3d at 196. The video provides ample evidence that UBJ members were placing American lives in jeopardy while damaging the Mission. In light of the testimony that Khatallah was UBJ's leader, the phone records purporting to show Khatallah communicating with UBJ members during the attack, and the fact that Khatallah showed up armed later on the same night, a reasonable juror could have found those armed UBJ members present to be Khatallah's co-conspirators. Finally, the conspiracy was to destroy the Mission, so the assault on the Mission was clearly in furtherance of the conspiracy. Given that the Mission was heavily guarded, the UBJ members' violent actions against Americans were a reasonably foreseeable consequence of the conspiracy. A rational jury had plenty of evidence to find beyond a reasonable doubt that Khatallah violated Section 1363 within the diplomatic premises definition of the special jurisdiction.

Khatallah makes three arguments to resist this conclusion, but none is persuasive.

First, he argues that even if violating the enhanced version of Section 1363 by placing a life in jeopardy is an offense against a person, that is "irrelevant" because the jury was not told that this was the only path for conviction. Khatallah Reply Br. 29. But motions for an acquittal based on insufficient evidence cannot depend on jury instructions. *See Musacchio*, 577 U.S. at 243; *see also Griffin v. United States*, 502 U.S. 46, 49 (1991) (explaining the pre-Revolutionary common law principle that "a … verdict was valid so long as it was legally supportable on one of the submitted grounds—even though that gave no assurance that a valid ground, rather than an invalid one, was actually the basis for the jury's action"). As such, it does not matter for Khatallah's sufficiency of the evidence challenge if the jury was provided with an erroneous path to a guilty verdict via the dwelling enhancement as long as a properly instructed jury had enough evidence for conviction.

Khatallah's second argument is that we should apply a categorical approach to the diplomatic premises definition. He argues unless the "offense" in the diplomatic premises definition has, as an essential element, that the crime be committed against an American, that definition of the special jurisdiction cannot apply.

We disagree; whether an offense is "committed by or against a national of the United States" is determined by the facts of the charged offense, not by the offense's legal elements. The diplomatic premises definition applies to "offenses committed by or against a national of the United States" that take place on U.S. diplomatic premises. 18 U.S.C. § 7(9). The term "offense" is ambiguous: it can refer to "a generic crime, say, the crime of fraud or theft in general," but

it can also "refer to the specific acts in which an offender engaged on a specific occasion, say, *the* fraud that the defendant planned and executed." *Nijhawan v. Holder*, 557 U.S. 29, 33–34 (2009). Despite Khatallah's arguments, we have little trouble concluding that "offense" in the diplomatic premises definition is circumstance specific, not categorical.

In this case, none of the "three basic reasons for adhering to an elements-only inquiry" are present. *Mathis v. United States*, 579 U.S. 500, 510 (2016). Applying the factors in *Mathis*, it would be inappropriate to apply a categorical approach to the phrase "offenses committed by or against a national of the United States." First, reference to the offense "committed" does not suggest a categorical approach; instead, it suggests the facts are what matter. *See id.* at 511 (citing *United States v. Hayes*, 555 U.S. 415, 421 (2009) (interpreting "offense … committed" in a circumstance-specific way)). Courts typically apply the categorical approach when the statute depends on "convictions" or explicitly relies on the "elements" of a crime, not when it refers to what was "committed." *See, e.g.*, *id.* (applying the categorical approach in part because the Armed Career Criminal Act (ACCA) refers to "convictions" for violent felonies). Second, the Sixth Amendment right to a trial by jury is not implicated because the diplomatic premises definition asks about the facts of the offense for which the defendant is being tried at the moment, not a past offense such as a conviction for a violent felony that serves to aggravate a sentence in the ACCA context. *Id.* at 511–12. And for the same reason—there is no prior litigation involved—there is no question of relying on facts that were found without adversarial process. *Id.* at 512. We thus conclude that a categorical approach is inappropriate to interpret the diplomatic premises definition of the special jurisdiction.

Khatallah's third argument is that the diplomatic premises definition can never apply to Section 1363 because that statute's "focus … is on the property," as evidenced by the fact that the defendant must "willfully and maliciously" destroy property but does not have to "willfully and maliciously" place a life in jeopardy. Khatallah Reply Br. 29–30; *see* 18 U.S.C. § 1363. We reject this argument as well. The special jurisdiction definition does not apply only to offenses that "are primarily committed against a national of the United States" or that have a "focus on harming American persons," so we fail to see the significance of the statute's "focus" when determining whether there was sufficient evidence that Khatallah's crime occurred within the special jurisdiction.

In sum, the jury had ample evidence to find beyond a reasonable doubt that Khatallah was vicariously liable for placing American lives in jeopardy on the premises of an overseas diplomatic mission, so it could have found, and reasonably did find, Section 1363's jurisdictional element satisfied.

**B**

In the alternative, Khatallah argues he is entitled to a new trial because the jury was not properly instructed about Count 16's jurisdictional element and would have acquitted him if it had been.

Khatallah did not object to the jury instructions, so he must at least meet the requirements of plain error review.[7] *See* FED.

---

[7] Because Khatallah jointly proposed the jury instructions with the government, the government argues that any instructional error was invited by Khatallah and he is "barred from complaining about it on appeal." Gov't Opening Br. 52 (quoting *United States v.*

R. CRIM. P. 52(b); *United States v. Purvis*, 706 F.3d 520, 522 (D.C. Cir. 2013) (courts review unobjected-to jury instructions for plain error). "Under that standard," we grant a new trial only if there was "(1) error, (2) that is plain, and (3) that affects substantial rights … [and] if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (cleaned up). "Meeting all four prongs of plain error is difficult, as it should be." *Puckett v. United States*, 556 U.S. 129, 135 (2009) (cleaned up).

In its jury instructions for Count 16, the district court properly explained the substantive conduct required to violate Section 1363. It also explained that because Khatallah was charged with the enhanced version of the crime, the jury had to find beyond a reasonable doubt that "the building was a dwelling or the life of any person was placed in jeopardy." Trial Tr. 5897 (Nov. 15, 2017, PM). As to that statute's special jurisdiction element, the court listed the various facilities that are covered by the diplomatic premises definition while omitting the preface that the crime in question must be committed "by or against a national of the United States." *Id.*; *see* 18 U.S.C. § 7(9).

This omission was erroneous, as the government concedes. Violations of Section 1363 can occur only "within the special maritime and territorial jurisdiction of the United States," so the government had to prove, and the jury had to find beyond a reasonable doubt, that the damage to the Mission occurred within that special jurisdiction. *United States v. Gaudin*, 515 U.S. 506, 511 (1995) ("The Constitution gives a criminal

---

*Harrison*, 103 F.3d 986, 992 (D.C. Cir. 1997)). We hold that Khatallah's challenge fails even under the plain-error standard, and therefore do not reach the question whether Khatallah's challenge is barred by the invited error doctrine.

defendant the right to demand that a jury find him guilty of all the elements of the crime with which he is charged."). Here, the government asserted only the diplomatic premises definition of the special jurisdiction as its jurisdictional hook. The jury, however, was not instructed that this definition required the offenses be "committed by or against a national of the United States." 18 U.S.C. § 7(9). The instructions were therefore erroneous: they omitted a factual element that the jury had to find in order to convict Khatallah of violating Section 1363. Moreover, although we need not decide the issue, we assume for the purpose of this appeal that the error was plain.

For the third prong of plain error, the error's effect on substantial rights, Khatallah has to show "a reasonable probability that, but for the error claimed, the outcome of the proceeding would have been different." *Greer v. United States*, 141 S. Ct. 2090, 2096 (2021) (cleaned up). The error affected Khatallah's substantial rights only if there is a "reasonable probability" that the jury would have acquitted him of Count 16 if properly instructed. *Id.* Khatallah's arguments fall short.

Khatallah's argument for prejudice boils down to an implicit jury finding he claims is "[t]he only sensible way to understand the jury's verdicts." Khatallah Opening Br. 49. Khatallah points out that the jury acquitted him of all the counts in the indictment charging him with the deaths in the Mission. Those acquittals, he claims, are inconsistent with finding him responsible for the first wave of the attack on the Mission. After all, if the jury thought he was responsible as a co-conspirator for what happened at that time, it would have found that he was liable under *Pinkerton* for the deaths in the Villa that resulted from the fire started in the first wave. Therefore, Khatallah asserts, the jury implicitly found that he was responsible only for what happened during the second wave of

the attack on the Mission, after the Americans had evacuated.[8] He claims that if the jury had been properly instructed that it could convict on Count 16 only if Khatallah committed a crime "against a national of the United States," the jury likely would have acquitted him.

In addition, Khatallah maintains the jury's conviction under Count 16 can be explained by the jury's finding that he injured a dwelling. The jury was instructed that it could apply the Section 1363 enhancement if a life was placed in jeopardy *or* if the building damaged was a dwelling. During the second wave of the attack on the Mission, Khatallah was caught on camera while the Tactical Operations Center was ransacked, and testimony at trial suggested that the Tactical Operations Center was a dwelling. There were no American lives to place in jeopardy at that point in the attack. Khatallah reasons that the jury must have convicted him on Count 16 because of the dwelling enhancement, because the jury was not instructed that the offense had to be committed against a national of the United States. Destruction of a dwelling satisfies the statutory enhancement in Section 1363, but Khatallah says it does not come within the special jurisdiction under the diplomatic premises definition. Therefore, Khatallah posits, if the jury had been properly instructed that it must find an American life was in jeopardy, it would have likely acquitted him.[9]

---

[8] The jury also acquitted Khatallah of Count 17, which was for "destroying and injuring dwellings and property, that is, the Annex," so we assume that he correctly reads the verdicts to at least rule out his criminal responsibility for what happened *after* the second wave of the attack. App. 165.

[9] Nor is the government arguing in this case that Khatallah's conviction could survive if the jury only convicted under the

Khatallah's theory of an implicit jury finding is not wholly implausible, but he has fallen short of demonstrating a "reasonable probability" that a properly instructed jury would have acquitted him. *Greer*, 141 S. Ct. at 2096. There was overwhelming evidence that Khatallah's co-conspirators attacked the Mission while Americans were present, but there is a much weaker link between Khatallah and the deaths at the Villa. So it was eminently sensible for the jury to find both that Khatallah was responsible for endangering American lives and that there was reasonable doubt that he was responsible for any deaths. *See Khatallah V*, 314 F. Supp. 3d at 189.

The jury could have found that Khatallah was vicariously responsible for the first wave of the attack on the Mission where American lives were in danger but was not responsible for either the deaths that resulted from the first wave or the subsequent attack on the Annex. There was substantially more evidence linking Khatallah to the first wave of the attack in general—when American lives were placed in jeopardy—than there was connecting him to the specific fires that caused the deaths at the Mission. The Libyana phone records—discussed above and which a reasonable jury, we hold, could have found to be authentic—showed that Khatallah was in frequent communication with specific UBJ militants during the first wave of the attack, but neither they nor the surveillance footage show who set the Villa on fire. *Khatallah IV*, 313 F. Supp. 3d at 183–84. We agree with the district court that "[t]he jury may have … believed that the fires were set by other militants on the scene—of which, according to evidence introduced at trial, there were dozens." *Khatallah V*, 314 F. Supp. 3d at 189.

---

"dwelling" enhancement of Section 1363, an issue we need not decide. *See supra* note 6.

While the government argued that all those who attacked were Khatallah's co-conspirators, they did little to support this assertion. Khatallah was not a member of any of the other militias, and the government did not point to any phone records indicating coordination with other attackers. *Khatallah IV*, 313 F. Supp. 3d at 183–84. The government argued at closing that Khatallah spoke with commanders of other militias at the Mission, but even if the jury believed that, it does not show that Khatallah was party to an affirmative agreement with any other militia, let alone whichever militia members killed Ambassador Stevens and Sean Smith. Thus, there was ample room for reasonable doubt about Khatallah's vicarious liability for the deaths in the Mission. A reasonable juror could acquit for these deaths, but still find that Khatallah was liable for placing Americans' lives in jeopardy.[10] In fact, given the strength of the evidence for Khatallah's conspiratorial involvement in the first wave of the attack, that is the best explanation of the verdicts. There was therefore no reasonable probability the jury would have acquitted Khatallah on Count 16 if properly instructed.

Finally, we note that Khatallah's interpretation of the jury's verdicts is difficult to reconcile with the evidence. For the jury to have implicitly found that Khatallah was not responsible for the first wave of attacks, it would have had to believe that Khatallah—who was portrayed by multiple witnesses as UBJ's leader—was totally uninvolved in his subordinates' plan to launch a terrorist attack even though he joined it halfway through, armed with an AK-47. The jury also

---

[10] There was also plenty of evidence that UBJ members damaged U.S. property even if they had nothing to do with burning down the Villa. For example, one UBJ member and close associate of Khatallah's was identified on video pouring gasoline on a Mission vehicle to light it on fire.

would have had to discount the telephone records and al-Ubydi's testimony, which the court found credible. Finally, Khatallah's theory was not presented to the jury and was inconsistent with the defense offered. The defense's primary argument was that Khatallah showed up knowing nothing of the attack and went to the Mission just to "see what was going on," not that he joined the conspiracy when he arrived. Trial Tr. 6133–34 (Nov. 16, 2017, PM). The jury's convictions indicate it did not accept the defense's account.

Khatallah has not demonstrated it is reasonably probable that this jury would have acquitted him if it had been properly instructed as to Count 16. *See Greer*, 141 S. Ct. at 2096. Finding the instructional error did not affect his "substantial rights," we decline to vacate his conviction.[11]

**IV**

Khatallah challenges his conviction on Count 18 for using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). He claims that his Section 1363 conviction does not qualify as a predicate crime of violence and that the district court therefore should have granted his motion for an acquittal on Count 18. Alternatively, he claims his conviction on Count 18 should be vacated because the district court wrongly instructed the jury that violating Section 1363 was a crime of violence.[12]

---

[11] Because we decline to vacate Count 16, we need not address Khatallah's claim for vacatur of his other convictions because they were "premised upon Count 16." Khatallah Opening Br. 52.

[12] Khatallah also argues that the application of Section 924(c) in this case would be impermissibly extraterritorial. Section 1363 expressly applies to offenses committed "within the special maritime

**A**

Section 924(c) subjects any person who uses or carries a firearm "during and in relation to any crime of violence" to a mandatory minimum prison sentence of five years, 18 U.S.C. § 924(c)(1)(A)(i), to run consecutively with any other prison sentence, *id.* § 924(c)(1)(D)(ii). An enhanced minimum sentence of ten years applies if the defendant used a semiautomatic assault weapon. *Id.* § 924(c)(1)(B)(i).

Section 924(c) defines two categories of offenses as predicate crimes of violence. Its elements clause covers any felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A). And its residual clause covers any felony that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." *Id.* § 924(c)(3)(B). The Supreme Court has held that the residual clause is void for vagueness. *United States v. Davis*, 139 S. Ct. 2319 (2019). An offense must therefore fall within the elements clause to support a Section 924(c) conviction.

We apply a "categorical approach" to determine whether an offense falls within Section 924(c)'s elements clause. *Davis*, 139 S. Ct. at 2328. Under this approach, we "focus solely on whether the elements of the crime of conviction" require the use, attempted use, or threatened use of physical force against the person or property of another, "while ignoring

---

and territorial jurisdiction of the United States." And after Khatallah filed his opening brief, we held that the territorial reach of Section 924(c) is coextensive with the territorial reach of the underlying predicate offense. *United States v. Garcia Sota*, 948 F.3d 356, 362 (D.C. Cir. 2020). In light of *Garcia Sota*, Khatallah presses his extraterritoriality claim only to preserve it for further review.

the particular facts of the case." *Mathis*, 579 U.S. at 504. In other words, we presume that the defendant's conviction "rested upon nothing more than the least of the acts criminalized." *Moncrieffe v. Holder*, 569 U.S. 184, 191 (2013) (cleaned up).

Some statutes, known as "divisible" statutes, "list elements in the alternative, and thereby define multiple crimes." *Mathis*, 579 U.S. at 505. When a statute defines multiple offenses and only some of them are crimes of violence, we apply a "modified categorical approach." *Id.* Under this approach, we look to "a limited class of documents," such as the indictment, jury instructions, and verdict form, "to determine what crime, with what elements, a defendant was convicted of." *Id.* at 505–06; *see Johnson v. United States*, 559 U.S. 133, 144 (2010). If the relevant documents establish with "legal certainty" that the conviction was for a crime of violence, the conviction may be used as a predicate offense. *Mathis*, 579 U.S. at 515 n.6 (cleaned up). If the relevant documents are "ambiguous," the conviction "may not be used." *United States v. Mathis*, 963 F.2d 399, 410 (D.C. Cir. 1992).

Other statutes merely list "various factual means of committing a single element." *Mathis*, 579 U.S. at 506. For these statutes, we may not consider how the defendant committed the offense. *See id.* at 509. If any of the means does not require the use, attempted use, or threatened use of physical force against the person or property of another, then the offense is not a crime of violence. *See id.*

Count 18 of the indictment charged that Khatallah and others used or carried firearms during and in relation to several crimes of violence, namely the offenses charged in Counts 1–17. The jury instructions likewise stated without qualification that those counts charged predicate crimes of violence. The

jury acquitted Khatallah on Counts 3–15 and 17. And the government has declined to argue on appeal that Counts 1 and 2, which charged Khatallah with conspiring to provide material aid to terrorists and providing material aid to terrorists in violation of Section 2339A, were crimes of violence. That leaves Count 16, charging Khatallah with an offense under Section 1363, as the only possible basis for sustaining his conviction on Count 18. As noted above, Section 1363 imposes criminal liability on anyone who "willfully and maliciously destroys or injures any structure, conveyance, or other real or personal property, or attempts or conspires to do such an act" within the special maritime and territorial jurisdiction of the United States. 18 U.S.C. § 1363.

**B**

We begin with Khatallah's acquittal argument. Khatallah argues that Count 16 did not charge a crime of violence because it is possible to violate Section 1363 by conspiring to injure property. Mere conspiracy does not necessarily involve the use, attempted use, or threatened use of force. As a result, Khatallah concludes, no properly instructed jury could have based a Section 924(c) conviction on Count 16.

The government concedes that conspiring to injure property is not a crime of violence. But it contends that Section 1363 is divisible into an inchoate offense of conspiring to injure property and a substantive offense of injuring property, the latter of which is a crime of violence. And it argues that documents such as the indictment show to the requisite degree of certainty that Khatallah was convicted of the substantive

offense. We agree with both contentions, and we find more than sufficient evidence to support the conviction.[13]

**1**

Section 1363 is divisible. The law has long treated conspiracy to commit a crime and the substantive crime that is the object of the conspiracy as distinct offenses rather than alternative means. There is no reason to think Section 1363 departed from this settled principle.

In *American Tobacco Co. v. United States*, 328 U.S. 781 (1946), the petitioners had been convicted of both monopolization and conspiracy to monopolize. *Id.* at 783. Both convictions rested on the same statutory provision, which subjected any person "who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize" to a fine of up to $5,000, imprisonment of up to a year, or both. *See id.* at 784 n.2 (cleaned up). The petitioners asserted that they had been twice convicted of the same offense, in violation of the Double Jeopardy Clause. *Id.* at 788. The Supreme Court disagreed because "[i]t long has been settled … that a conspiracy to commit a crime is a different offense from the crime that is the object of the conspiracy." *Id.* at 789 (cleaned up).

The Court reaffirmed this principle in *Callanan v. United States*, 364 U.S. 587 (1961). The petitioner in that case had been convicted of both Hobbs Act robbery and conspiracy to commit Hobbs Act robbery. *Id.* at 587–88. Both convictions

---

[13] Section 1363 also covers attempting to injure property. An attempted crime of violence is not always itself a crime of violence. *See United States v. Taylor*, 142 S. Ct. 2015, 2021–22 (2022). But neither party suggests that the inclusion of attempt affects the outcome here, so we do not consider that question.

arose from the same statute, which subjected any person who "obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires to do so" to a fine of up to $10,000, a prison term of up to 20 years, or both. *See id.* at 588 n.1 (cleaned up). The district court sentenced the petitioner "to consecutive terms of twelve years on each count," for a total sentence of 24 years. *Id.* at 588. The petitioner argued that he was either subjected to a punishment exceeding the statutory maximum or to "two penalties" for the same offense. *Id.* at 589. The Supreme Court affirmed the sentence. It stressed that "[t]he distinctiveness between a substantive offense and a conspiracy to commit is a postulate of our law." *Id.* at 593. As a result, "the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses." *Id.* (cleaned up).

Khatallah offers three reasons why, despite this established principle, Section 1363's conspiracy and substantive offenses are not distinct. None persuades.

First, Khatallah notes that conspiring to injure property carries the same penalty as actually doing so. It is true that two statutory alternatives are distinct offenses if they carry different punishments. *Mathis*, 579 U.S. at 518. But statutory alternatives can be distinct offenses even if they do not. As noted above, the statutes in both *American Tobacco* and *Callanan* imposed the same penalty for both conspiracy and the substantive offense. *See* 364 U.S. at 588 n.1; 328 U.S. at 784 n.2.

Second, Khatallah asserts that because Section 1363 enumerates destroying, injuring, attempting, and conspiring in a single list of alternatives, there is no textual basis for treating some of them as elements and others as means. Because

destroying and injuring property are not distinct offenses, he reasons, conspiracy must also be just another factual means for committing the one statutory offense. *Callanan* forecloses this argument as well, for the statute at issue there had the same structure as Section 1363. It listed different means of committing the substantive offense ("obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion"), followed by attempt ("or attempts … to do so"), followed by conspiracy ("or conspires to do so"). *See* 364 U.S. at 588 n.1 (cleaned up). Yet the Court held that the statute created a distinct conspiracy offense.

Third, Khatallah relies on the jury instructions, which stated that he satisfied the first element of the offense charged in Count 16 if he "injured or destroyed or attempted to injure or destroy or aided and abetted another to do the same or participated in a conspiracy to injure or destroy" property. Trial Tr. 5896–97 (Nov. 15, 2017, PM). These instructions are irrelevant to the question whether Section 1363 is divisible. Where "authoritative sources of [federal] law" establish that a federal statute is divisible, we cannot rely on instructions from a single trial to reach a contrary conclusion. *See Mathis*, 579 U.S. at 517–19.

**2**

Because Section 1363 is divisible, we consider whether the documents referenced in *Mathis* show with legal certainty that a properly instructed jury would have convicted Khatallah of the substantive offense. *See* 579 U.S. at 505–06. Count 16 of the indictment charged that Khatallah "did willfully and maliciously destroy and injure" the Mission. App. 17. It did not charge him with conspiracy. Therefore, a properly instructed jury would have been told that, to convict Khatallah

as charged, it needed to find that he injured the Mission, either directly or through *Pinkerton* co-conspirator liability. While a properly instructed jury could have convicted Khatallah of a substantive Section 1363 offense through *Pinkerton* liability, it is legally certain that a jury so instructed could not have convicted Khatallah of mere conspiracy.[14]

**3**

Finally, we consider whether a properly instructed jury could have found either that Khatallah himself used a firearm while committing a substantive offense of injuring property within the special maritime and territorial jurisdiction of the United States, which would make him directly liable for violating Section 924(c), or that one of his co-conspirators did so foreseeably and within the scope of the material-support conspiracy, which would make Khatallah liable for the co-conspirator's violation of Section 924(c) under *Pinkerton*.

Ample evidence existed to support a conviction for a substantive Section 1363 offense under *Pinkerton*. As discussed above, plenty of evidence showed that Khatallah's co-conspirators damaged the Mission foreseeably and within the scope of the conspiracy. *See supra* Part III. Likewise, plenty of evidence showed that Khatallah's co-conspirators used firearms during their attack on the Mission. Video cameras captured two co-conspirators, Jamaica and Dijawi, carrying AK-47s while participating in the first wave of the attack. The government presented this video evidence at trial, and a witness identified both Jamaica and Dijawi and the

---

[14] Because the indictment unambiguously charged only the substantive offense, we need not decide whether, in the posture of a motion for acquittal, the necessary legal certainty would be absent if the indictment had charged both the substantive offense and conspiracy.

weapons they were carrying. Moreover, the use of firearms obviously would further a conspiracy to attack the Mission, and it was foreseeable that serious weapons like AK-47s would be needed to launch an open attack on a U.S. diplomatic facility. The jury thus had a reasonable basis for convicting Khatallah on a *Pinkerton* theory of liability for Count 18.

Khatallah objects that we do not know whether the jury predicated the Section 924(c) conviction on a substantive offense of injuring property, as opposed to the offense of conspiring to do so, because the instructions permitted the jury to convict on Count 16 for a conspiracy offense and then stated without qualification that the offense charged in Count 16 was a crime of violence. Trial Tr. 5897–98 (Nov. 15, 2017, PM). This argument is misplaced in the context of an acquittal motion, which, as explained earlier, tests sufficiency against "how a properly instructed jury would assess the evidence," not on "how the jury was instructed." *United States v. Hillie*, 14 F.4th 677, 682 (D.C. Cir. 2021) (cleaned up). Because a properly instructed jury could readily have convicted on Count 18, the district court properly denied Khatallah's acquittal motion.

## C

We now turn to Khatallah's challenge to the jury instructions on Count 18. Because Khatallah did not object to the instructions below, we review this claim only for plain error. FED. R. CRIM. P. 52(b).[15]

---

[15] The government argues that Khatallah invited any error by jointly proposing the instructions, and that his challenge to the instructions is thus unreviewable. As with his challenge to his Section 1363 conviction, Khatallah cannot show plain error, so we need not resolve whether the invited-error doctrine applies here.

The parties dispute whether the instructions on Count 16 impermissibly allowed the jury to convict Khatallah of an uncharged conspiracy offense, which could not serve as a predicate crime of violence for the Section 924(c) conviction, or whether the mention of conspiracy in Count 16 simply referred to instructions allowing the jury to convict Khatallah of a substantive offense under *Pinkerton*. The parties also dispute whether any instructional error in this regard was sufficiently clear or obvious. We need not resolve either of these disputes because any error, even if clear or obvious, was not prejudicial.

To satisfy the third requirement of plain-error review, Khatallah must show "a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Greer*, 141 S. Ct. at 2093 (cleaned up). For reasons explained above, Khatallah cannot make that showing. Overwhelming evidence established Khatallah's *Pinkerton* liability for his co-conspirators' acts injuring the Mission. And video evidence plainly showed the co-conspirators using firearms while doing so. A jury properly instructed that only a substantive Section 1363 offense qualifies as a crime of violence would still very likely have convicted on Count 18.

For these reasons, we decline to set aside Khatallah's conviction under Section 924(c).

# V

Khatallah argues that the government's improper and prejudicial comments during closing arguments require a new trial. Specifically, Khatallah claims that the prosecutor made unlawful inflammatory statements by appealing to the jury's emotions and nationalism, while also denigrating the factual stipulations to which the government and defense had agreed.

We review the district court's denial of a mistrial motion complaining of prosecutorial misconduct for an abuse of discretion. *United States v. Moore*, 651 F.3d 30, 50 (D.C. Cir. 2011) (per curiam). When a prosecutor commits misconduct to which the defendant objected at trial, the government bears the burden on appeal to show that the unlawful remarks were not substantially prejudicial. *United States v. Gartmon*, 146 F.3d 1015, 1026 & n.5 (D.C. Cir. 1998) (citing *United States v. Olano*, 507 U.S. 725, 734 (1993)).

Reviewing the record, we agree with Khatallah that the prosecutor's remarks were plainly improper and unbefitting a federal prosecutor. But because the misconduct did not substantially prejudice Khatallah, the district court did not abuse its discretion in denying the motion for a new trial.

**A**

The government does not contest, nor could it on this record, that the prosecutor's statements in her closing rebuttal crossed the line. *See* Gov't Opening Br. 63.

It is settled law that "a prosecutor may not use the bully-pulpit of a closing argument to inflame the passions or prejudices of the jury or to argue facts not in evidence." *United States v. Childress*, 58 F.3d 693, 715 (D.C. Cir. 1995) (per curiam). So during closing arguments, prosecutors may not sensationalize the facts or seek to turn jurors' perceived prejudices or favoritism against a defendant. *See Moore*, 651 F.3d at 51–52. Nor may the government weaponize a jury's allegiance to their Nation or incite jurors to protect their community or act as its conscience. *See United States v. Vega*, 826 F.3d 514, 525 (D.C. Cir. 2016) (per curiam); *see also United States v. Johnson*, 231 F.3d 43, 47 (D.C. Cir. 2000). The law also "universally condemn[s]" arguments that ask jurors to identify themselves with victims "because [they]

encourage[] the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on evidence." *Caudle v. District of Columbia*, 707 F.3d 354, 359 (D.C. Cir. 2013) (internal quotation marks and citation omitted); *see also United States v. Hall*, 979 F.3d 1107, 1119 (6th Cir. 2020); *Arrieta-Agressot v. United States*, 3 F.3d 525, 527 (1st Cir. 1993) (reversing drug-distribution convictions because of prosecutor's closing arguments, in which he told the jury that "[n]obody has the right to … poison our children[,]" and applauded the Coast Guard for "protecting us" from "the evil of drugs"). When a prosecutor presses such an us-versus-them narrative in closing remarks to the jury, she walks a perilous legal line. *See Viereck v. United States*, 318 U.S. 236, 247–48 & n.3 (1943); *United States v. DeLoach*, 504 F.2d 185, 193 (D.C. Cir. 1974); *United States v. Moore*, 375 F.3d 259, 260 (3d Cir. 2004) (reversing conviction because, among other things, the prosecutor in closing statements delivered on September 10, 2002, repeatedly referred to a defendant on trial for arson and unlawful gun possession as a "terrorist").

The Assistant U.S. Attorney who gave the government's closing rebuttal surely knew this longstanding and foundational rule of law. On top of that, the district court had previously ordered her not to refer to the United States Mission in Benghazi, Libya as "our" Mission. *See* Trial Tr. 4456 (Nov. 1, 2017, AM) ("[J]ust refer to it as the U.S. Mission, okay?" "Yes, sir."); *see also Khatallah IV*, 313 F. Supp. 3d at 194. The court had also specifically directed the prosecution "to avoid gratuitous or unnecessary uses of the term[] [terrorist]." Order at 1–2, *United States v. Khatallah*, 313 F. Supp. 3d 176 (No. 1:14-cr-00141), ECF No. 371. Yet in her closing rebuttal, the prosecutor brushed off the court's orders. She began:

> At this moment, I cannot tell you how proud I am to represent the United States of America and how

honored I am to call the United States Mission in Benghazi ours.  Yes, it is ours.  And … Ambassador Christopher Stevens is our son.  And brave American Sean Smith is an American son.  And Glen Doherty and Tyrone Woods, Navy Seals, are our American sons.

And I cannot tell you how proud I am.  And yes, they are ours.  And the consulate and the other United States facility, the CIA Annex, that's ours too.  And I will take that to the bank, and I will take full responsibility for saying that that is ours.

Trial Tr. 6134–35 (Nov. 16, 2017, PM).

The prosecutor then turned to the defense's argument that Khatallah had an innocent explanation for being at the Mission on the night of September 11th.  She continued:

The defendant is guilty as sin.  And he is a stone cold terrorist.  Innocent presence?  Innocent presence? … His hit squad was searing through the United States Mission, searing violently with rage—his rage against America, brandishing AK-47s, [rocket-propelled grenades] and all sorts of weapons to *destroy us*, those innocent men who are on the compound.

Trial Tr. 6135 (Nov. 16, 2017, PM) (emphasis added).  Khatallah's counsel objected repeatedly.  *Id*. at 6136.

The prosecutor again referred to "our American facilities" and "our Mission[,]" personalizing the charged crimes as attacks on the jurors and the prosecution.  Trial Tr. 6149 (Nov. 16, 2017, PM); *see also id*. at 6146 (asserting that Khatallah is guilty of "attacking our facilities").  She accused Khatallah's

"hit squad" of "attacking *us*[,]" and asked rhetorically "[w]hy are you attacking *us*?" *Id*. at 6136 (emphases added).

Later, the prosecutor turned to denigrating the written stipulations Khatallah had entered into evidence, and which the government itself had agreed were accurate. Those stipulations were the product of "lengthy negotiation[s]" between Khatallah and the government, and the parties had agreed to "a preamble that explained to the jury that the stipulations were summaries of classified information concerning the [Benghazi] attacks[.]" *Khatallah IV*, 313 F. Supp. 3d at 184. Because the defense lacked access to the underlying classified information, they did not know the sources behind the information and could not call them to testify. *Id.*; *see also* Trial Tr. 5852–54 (Nov. 15, 2017, PM) (explanation of stipulations).

The prosecutor nevertheless disparaged the stipulations as "words on a piece of paper" and unfavorably contrasted them with "witnesses who you can see … who have been cross-examined, who have been challenged." Trial Tr. 6150 (Nov. 16, 2017, PM); *see also id.* at 6153–54 (again dismissing stipulations as "words on a piece of paper," and asserting that jurors "do not know the reliability of them whatsoever"). Defense counsel objected, and the court said it would deal with the objections "[a]fterwards." *Id*. at 6150. At a bench conference immediately after the government closed, Khatallah's counsel lodged several objections and moved for a mistrial, asking the court to reserve its decision until after the jury verdict. *Id*. at 6155–56.

We expect better from an attorney representing the United States. *See Berger v. United States*, 295 U.S. 78, 88 (1935) (although a prosecutor "may strike hard blows, [she] is not at liberty to strike foul ones"); *United States v. McGill*, 815 F.3d 846, 920 (D.C. Cir. 2016) (per curiam) ("A just outcome

obtained through a fair, evenhanded, and reliable process should be the government's goal; it is *not* to win at any cost.") (emphasis in original).

The "sole purpose of closing argument is to assist the jury in analyzing the evidence[.]" *Moore*, 651 F.3d at 52 (internal quotation marks and citation omitted). Yet here, the prosecutor repeatedly encouraged the jury to "substitute emotion for evidence[,]" and she made an appeal to nationalism that was "wholly irrelevant to any facts or issues in the case, the purpose and effect of which [was] only … to arouse passion and prejudice." *Vega*, 826 F.3d at 525 (internal quotation marks and citation omitted). In many regards, the prosecutor's call to arms was similar to the closing speech the Supreme Court found to be "highly prejudicial" in *Vierick v. United States*. 318 U.S. at 248. In that case, the government tried a registered German foreign agent during World War II for failing to divulge certain propaganda activity. *Id.* at 239–40. In his closing remarks, the prosecutor told the jury that the "American people are relying upon you … for their protection against this sort of crime, just as much as they are relying upon the protection of the men who man the guns in Bataan Peninsula[.]" *Id.* at 247 n.3. He then "call[ed] upon every one of [the jurors] to do [their] duty." *Id.* at 247–48 n.3. While the battles fought by the United States have changed, the law's condemnation of such rhetoric has not.

The prosecutor here further erred by maligning the stipulations entered into evidence by the defendant. In the stipulations, which were based on classified sources, the government agreed that it possessed certain information or that a person known to the government would, if called to the stand, testify to certain facts. *See, e.g.*, Trial Tr. 5853–54 (Nov. 15, 2017, PM). Especially because of the defense's limited access to the classified information underlying the stipulations, and

the government's express agreement to them, the prosecutor acted improperly in portraying the stipulations as untrustworthy and advising the jury to disbelieve them. Said another way, the prosecutor impermissibly and "intentionally misrepresent[ed] the evidence." *Moore*, 651 F.3d at 53.

**B**

Still, not all prosecutorial misconduct justifies vacating a jury verdict. "A mistrial is a severe remedy—a step to be avoided whenever possible, and one to be taken only in circumstances manifesting a necessity therefor." *United States v. McLendon*, 378 F.3d 1109, 1112 (D.C. Cir. 2004) (citation omitted). Here, if the prosecutor's rebuttal substantially prejudiced Khatallah, a mistrial would be required. *See Moore*, 651 F.3d at 50. To assess whether the prosecutor's rebuttal substantially prejudiced Khatallah, we consider "(1) the closeness of the case; (2) the centrality of the issue affected by the error; and (3) the steps taken to mitigate the error's effects." *Id.* at 51 (quoting *United States v. Becton*, 601 F.3d 588, 598 (D.C. Cir. 2010)). While we find the prosecutor's rebuttal argument "deeply troubling," the government has met its burden of showing that the wrongful remarks did not cause Khatallah "substantial prejudice." *McGill*, 815 F.3d at 921.

First, on the charges for which he was convicted, the case against Khatallah was not close. *See Moore*, 651 F.3d at 51. The jury convicted Khatallah for conspiring to provide, and providing, material support to terrorists, maliciously injuring property in the special jurisdiction of the United States, and carrying a firearm during a crime of violence. The government presented powerful and mutually reinforcing evidence of Khatallah's guilt on all four counts. *See* Parts III–IV, *supra*. Multiple witnesses attested to Khatallah's participation in the attack on the Mission, and their testimony was bolstered by

corroborating phone records and contemporaneous video footage from inside the Mission compound.

More specifically, Bilal al-Ubydi, a man overseeing a group of Libyan government militias, testified that several days before the attack he saw Khatallah, together with compatriots Aymen Dijawi and Zakaria Barghathi, securing munitions from a local military force.[16] On September 11th, both Dijawi and Barghathi were seen on camera attacking the U.S. Mission.[17] Phone records show that Khatallah was in contact with both men throughout the evening of September 11th, including right around the time that they were filmed at the compound. *See Khatallah V*, 314 F. Supp. 3d at 192–93.

The government also connected Khatallah with a third attacker from that night, a comrade of his known as Jamaica. According to FBI Special Agent Michael Clarke, Khatallah said during his interrogation that he spoke on the phone with Jamaica between 8:30 p.m. and 9 p.m. on September 11th while Jamaica was standing outside of the Mission. Trial Tr. 3867–68 (Oct. 30, 2017, AM); *id.* at 3935–36. Two witnesses identified Jamaica on camera carrying a gasoline can and firearm during the subsequent attack.[18]

---

[16] Trial Tr. 2399, 2460–61, 2463–72 (Oct. 17, 2017, PM) (al-Ubydi testimony).

[17] Trial Tr. 2548–49, 2551–52, 2556–57, 2562 (Oct. 18, 2017, AM) (al-Ubydi testimony); Trial Tr. 5062–63, 5066, 5077, 5059–61 (Nov. 7, 2017, AM) (Majrisi testimony); *see also* Trial Tr. 3869 (Oct. 30, 2017, AM) (Clarke testimony).

[18] Trial Tr. 5062, 5071–72, 5075–76 (Nov. 7, 2017, AM) (Majrisi testimony); Trial Tr. 2561 (Oct. 18, 2017, AM) (al-Ubydi testimony); *see also Khatallah V*, 314 F. Supp. 3d at 193.

Evidence at trial also firmly tied Khatallah to the scene of the attack. Al-Ubydi testified that Khatallah called him at approximately 10:15 p.m. on September 11th and told him in a threatening tone to withdraw two men who were stationed near the Mission. Trial Tr. 2531–34, 2543 (Oct. 18, 2017, AM). Khatallah told al-Ubydi that he was calling from near one of the militia's trucks guarding an orchard close to the Mission. *Id.* at 2537–39 (al-Ubydi testimony). Phone records confirm that Khatallah called al-Ubydi at 10:20 p.m. that night, albeit for a shorter period of time than al-Ubydi initially remembered.[19]

Special Agent Clarke also placed Khatallah near the Mission that evening. According to Clarke, Khatallah told the FBI in an interrogation that he had set up a roadblock near the Mission while the attack was underway. Trial Tr. 3901–04 (Oct. 30, 2017, AM). Khatallah said he used the roadblock to turn away militiamen "responding" to the attack. *Id.* at 3903 (Clarke testimony). According to another witness, Ali Majrisi, Khatallah later accused one of those militias of "interfer[ing]" with his plan to "kill everybody" associated with the Mission. Trial Tr. 4994–95 (Nov. 6, 2017, PM). Khatallah also told Clarke that, while he was near the Mission, he spoke by phone with a commander of a militia tasked with protecting the Mission. Trial Tr. 3946–48 (Oct. 30, 2017, PM); Trial Tr. 2400 (Oct. 17, 2017, PM). Khatallah asked the commander why the militia was shooting at "us[,]" and warned him that "[i]f you kill one of us, you will be in trouble." Trial Tr. 3947–48 (Oct. 30, 2017, PM) (Clarke testimony).

Finally, Khatallah was filmed entering a building on the U.S. compound armed with an automatic rifle just before

---

[19] *See* Trial Tr. 2608–09 (Oct. 18, 2018, PM); App. 868, at line 1608 (phone records); Trial Tr. 5583–85 (Nov. 13, 2017, PM).

midnight on September 11th.[20]   According to two witnesses viewing the video footage, Khatallah was accompanied by Dijawi, one of the men who had attacked the Mission in a previous wave and with whom Khatallah had picked up weapons.  *See* Trial Tr. 5085 (Nov. 7, 2017, AM) (Majrisi testimony); Trial Tr. 2632 (Oct. 18, 2017, PM) (al-Ubydi testimony).  After Khatallah exited the building, he gestured for several men to follow him.  *See* Gov't Ex. 301-44 (video evidence) (time stamp 00:02:25–00:02:32); *see also Khatallah V*, 314 F. Supp. 3d at 200.

In short, the record evidence overwhelmingly supports the jury's verdict, leaving little practical room for the prosecutor's appeals to nationalism and emotion to operate.

Second, the district court took substantial steps to ensure that Khatallah was tried by an impartial jury and to mitigate any prejudicial effects of the prosecutor's inflammatory and misleading remarks.  *See Moore*, 651 F.3d at 51.

Before the trial began, Judge Cooper required prospective jurors to complete a 28-page questionnaire to screen out jurors with relevant biases.  *See* Amended Prospective Juror Questionnaire, *United States v. Khatallah*, 313 F. Supp. 3d 176 (No. 1:14-cr-00141), ECF No. 328.  The questionnaire asked prospective jurors whether "non-citizens accused of crimes in U.S. courts should be afforded the same constitutional rights as U.S. citizens[,]" whether "'proof beyond a reasonable doubt' is too heavy a burden for the prosecution to have to meet in a terrorism trial[,]" and how difficult the prospective jurors would find it "to presume that a person who is charged with

---

[20]  *See* Gov't Ex. 301-44 (video evidence) (time stamp 23:54–23:55); Trial Tr. 2632–38 (Oct. 18, 2017, PM) (al-Ubydi testimony); Trial Tr. 5062, 5080–82, 5084–85 (Nov. 7, 2017 AM) (Majrisi testimony); *see also Khatallah V*, 314 F. Supp. 3d at 191.

conspiracy to kill United States citizens is innocent[.]" *Id.* at 24–26. Potential jurors were also asked for their views on the Islamic faith and United States policy toward predominantly Muslim countries, as well as the potential jurors' history with people of Libyan or Arabic descent. *Id*. at 9, 12; *see also Khatallah IV*, 313 F. Supp. 3d at 194 (district court explaining its efforts "to ensure that the defendant received a trial as free as possible of nationalistic and cultural biases").

The district court also gave an instruction on the spot to mitigate the effect of the government's inflammatory rebuttal. Shortly after the government spoke, Judge Cooper reminded the jury that "the arguments of counsel and statements of counsel and questions by counsel are not evidence in the case." Trial Tr. 6158 (Nov. 16, 2017, PM). The court added that "it is up to you to … disregard arguments of counsel as evidence." *Id*. at 6159. He asked the jury "[i]s that clear?" and the jury indicated that it understood. *Id*. Several days later, just before the jurors began their deliberations, Judge Cooper again emphasized that "the [closing] arguments of the lawyers that you heard … are not evidence in the case, nor are the lawyers' characterization of the evidence[.]" Trial Tr. 6197 (Nov. 20, 2017, AM).

The district court had made this point before. At the beginning of trial, Judge Cooper told the jury that lawyers' arguments are not evidence. Trial Tr. 543 (Oct. 2, 2017, AM). The judge also instructed jurors that they should not allow the presence of Arabic translators and Arabic-speaking witnesses to "influence or bias you in any way[.]" *Id.* at 547. Then, as the trial drew to a close, he repeated that "[t]he statements of the lawyers are not evidence." Trial Tr. 5867 (Nov. 15, 2017, PM). The court's concluding jury instructions, which it provided before the parties made their closing arguments, directed jurors to reach their decisions free of prejudice. Judge

Cooper told jurors that they were to "determine the facts without prejudice, fear, sympathy or favoritism[,]" and he specifically warned them against being "improperly influenced by anyone's race, ethnic origin or gender." *Id*. at 5866; *accord* Jury Instructions at 2, *United States v. Khatallah*, 313 F. Supp. 3d 176 (No. 1:14-cr-00141), ECF No. 464 ("Jury Instructions").

Though not a panacea, the trial judge's instructions mitigated the prosecutor's improper appeals to passion and prejudice. *See Moore*, 651 F.3d at 54 (instruction that lawyers' arguments are not evidence is "usually a strong ameliorative consideration for prosecutorial misconduct during … closing argument") (citation omitted); *see also McGill*, 815 F.3d at 922; *Childress*, 58 F.3d at 716.

The district court also specifically countered the prosecutor's misleading statements about the evidentiary stipulations. Shortly after the prosecutor concluded her rebuttal, Judge Cooper told the jury that the stipulations in evidence "were agreements that were negotiated between the defense and the government very carefully[,]" and that the jury, "in assessing the meaning of the stipulation[s]," should "read them carefully … [and] take them as they are written. No more, no less." Trial Tr. 6159 (Nov. 16, 2017, PM). Later, just before the jurors began their deliberations, the court stated explicitly that the evidence included "the stipulations between the parties[,]" and reminded them to read the written instructions about the stipulations. Trial Tr. 6197 (Nov. 20, 2017, AM). Those instructions reminded jurors that, "[d]uring the trial, you were told that the parties had stipulated—that is, agreed—to certain facts. You should consider any stipulation of fact to be undisputed evidence." Jury Instructions at 2, ECF No. 464; *accord* Trial Tr. 5866 (Nov. 15, 2017, PM).

Khatallah contends that the judge's post-rebuttal instruction did not address the real harm from the prosecutor's dismissal of the stipulation—her claim that stipulations are inherently less trustworthy than live witnesses. But the judge made clear that the jury should take the stipulations as "undisputed evidence[,]" and he pointed out that the government had agreed to them after careful negotiation. Trial Tr. 5866 (Nov. 15, 2017, PM); *accord* Jury Instructions at 2, ECF No. 464; *see also* Trial Tr. 6159 (Nov. 16, 2017, PM). That drained the prosecutor's ill-considered attack of much of its force. Given that, the district court had good reason to be "confident that the[] repeated explanations of the nature and legal effect of the stipulations … mitigated any potential confusion caused by the government's comment in its rebuttal argument." *Khatallah IV*, 313 F. Supp. 3d at 192.

Third, we "owe[] deference to the district court's assessment of … a statement's prejudicial impact on the jury." *Moore*, 651 F.3d at 51 (citation omitted); *see also McLendon*, 378 F.3d at 1113. Judge Cooper was present for the entire trial and could see how the jury reacted to the prosecutor's remarks and to the court's instructions. His careful findings that "the jury in this case did not rise to the [government's] bait[,]" and that the "improper attempts to elicit sympathy for the victims were futile or perhaps even counter-productive[,]" *Khatallah IV*, 313 F. Supp. 3d at 194, 196, are borne out by the record.

For example, the jurors' deliberations spanned five days, *see* App. 972–74 (docket entries), and the jury sent several substantive questions to the judge as they weighed the facts, *see, e.g.*, Note from Jury at 1, *United States v. Khatallah*, 313 F. Supp. 3d 176 (No. 1:14-cr-00141), ECF No. 486 ("What is the definition of 'brandishing' in [C]ount 18?"); Note from Jury at 1, *United States v. Khatallah*, 313 F. Supp. 3d 176 (No. 1:14-cr-00141), ECF No. 483 ("Were we provided with all

available surveillance video at the [M]ission?"). The jury then acquitted Khatallah on all but four of the eighteen charges against him, and it made an express finding that Khatallah's actions did not result in death. As the district court observed, the jury's mixed verdict suggests that its decisionmaking was not inflamed or driven by the prosecutor's regrettable appeals to passion and prejudice. *See Khatallah IV*, 313 F. Supp. 3d at 196. Notably, the jury acquitted on the charges most directly implicated by the prosecutor's incendiary rhetoric—those accusing Khatallah of killing Americans. *See United States v. Small*, 74 F.3d 1276, 1284 (D.C. Cir. 1996) (finding a jury's acquittal on the charge most connected to a prosecutor's wrongful remarks to be "a strong indication that any prejudice did not impermissibly infect [the defendant's] conviction").

Of course, a split verdict is not unassailable evidence that a jury was unmoved by the government's wrongful remarks, especially when, as here, the government's improper statements addressed issues that were central to the case. Still, the jury's conduct in this case indicates that it "took [the court's] instruction[s] to heart and weighed the evidence, unswayed by whatever passions and prejudices the prosecutor['s] statements might have attempted to stoke." *McGill*, 815 F.3d at 922; *see also Small*, 74 F.3d at 1284 (finding prosecutor's wrongful comments not substantially prejudicial because, among other reasons, "nothing in the record suggests that the jury did not follow the instructions that arguments of counsel were not evidence") (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)).

As a result, after according due weight to the district court's on-the-ground judgment, the jury's nuanced verdict and lengthy deliberations, the overwhelming evidence of Khatallah's guilt, and the district court's repeated and targeted curative instructions, we agree with the district court that

Khatallah was not substantially prejudiced by the government's rebuttal. *See Moore*, 651 F.3d at 53 (Even where allegedly unlawful prosecutorial comments "appeared at times to address central issues in the case," the comments were not substantially prejudicial because "there was overwhelming evidence of appellants' guilt of the crimes implicated by the prosecutor's purported misconduct, and the district court [repeatedly] gave general limiting instructions on the arguments of counsel to the jury[.]").

Khatallah responds that the prosecutor's own conduct shows that she expected that her rhetoric would affect the jury. Khatallah also argues that the remarks were substantially prejudicial because they were made in rebuttal, when he had no opportunity to respond beyond objecting. Neither argument succeeds.

First, the fact that a prosecutor made inflammatory and improper statements, in violation of the district court's orders, does not by itself show that the government had a weak case. If clearly wrongful comments were self-evidently prejudicial, our separate tests for substantial prejudice and prosecutorial misconduct would collapse into one. Instead, in assessing substantial prejudice, this court focuses on the closeness of the case, the centrality of the issues affected, and the steps the trial court took to mitigate the errors. *See United States v. Fahnbulleh*, 752 F.3d 470, 480 (D.C. Cir. 2014). Whatever the prosecutor's subjective motivations or beliefs, on balance those factors show that Khatallah was not prejudiced by her improper statements.

That the prosecution's misconduct occurred during rebuttal does not change the outcome either. Though defendants are particularly vulnerable during the government's rebuttal because they cannot respond to wrongful remarks, *see*

*United States v. Holmes*, 413 F.3d 770, 776 (8th Cir. 2005), any prejudicial effect was tempered here by Khatallah's attorney correctly predicting in her own closing statement that the government would try to rile up the jury. In fact, she specifically warned jurors not to be taken in by the prosecutor's "very impassioned … pleas[.]" Trial Tr. 6134 (Nov. 16, 2017, PM); *see also id.* ("I don't get an opportunity to respond [to the government's rebuttal]. So I would ask you to think critically about what you hear and to make sure that what you're listening to is evidence as opposed to appeals to your sympathies."); *id.* at 6051 (Khatallah's counsel accusing the government of "play[ing] with your emotions[,]" including by "repeatedly referring to … our [M]ission, our consulate, our [A]mbassador[.]"). Those arguments anticipatorily threw a wet blanket on the government's inflammatory statements. *Cf. Gaither v. United States*, 413 F.2d 1061, 1080 (D.C. Cir. 1969) (reasoning that prejudicial effect of prosecutor's misstatement was "largely countered" by the defense counsel's contemporaneous objection and his summation "vigorously contest[ing] the … misstatement"). For that reason, as the district court found, the prosecutor's remarks may well have hurt rather than helped the government's case. *See Khatallah IV*, 313 F. Supp. 3d at 196.

In sum, though the prosecutor's statements in rebuttal were unlawful, we hold that the district court did not abuse its discretion in denying the motion for a mistrial.

## VI

The government separately appeals the length of the sentence that the district court imposed. The government argues that the 22-year sentence was a substantively unreasonable variance from the suggested Guidelines sentence of life imprisonment plus ten years. Because the mandatory

minimum sentence for Khatallah's Section 924(c) offense alone accounted for ten of those 22 years, the district court imposed a sentence of just twelve years for all of the non-Section 924(c) charges combined—charges that independently supported a Guidelines sentence of life in prison.

The district court attributed part of the variance to avoiding any reliance on charged conduct for which the jury had acquitted Khatallah. The government does not dispute that the district court was permitted to discount acquitted conduct, and so we take that as given in this case. But in sentencing Khatallah to just twelve years for the two support-of-terrorism counts and the property destruction count, the district court did not—and could not on this record—sufficiently justify its additional variance so far below the sentencing range that would have been appropriate even without any consideration of acquitted conduct. It must be remembered that Khatallah was convicted of two counts of supporting terrorism and one count of attacking a United States Mission. Given the gravity of such an assault on an American diplomatic facility and the district court's own recognition of the vital need to deter such crimes, the district court's weighing of the Section 3553(a) factors could not have supported such a stark additional variance beyond discounting acquitted conduct. For that reason, we reverse and remand for resentencing.

## A

The starting point of any federal sentencing proceeding is "correctly calculating the applicable Guidelines range[,]" which serves as the "initial benchmark" in determining an appropriate sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). The Guidelines, though, are not mandatory. *See United States v. Booker*, 543 U.S. 220, 258–59 (2005). So the district court retains the discretion to vary upward or downward

from the Guidelines range after considering statutorily prescribed sentencing factors.  *See* 18 U.S.C. § 3553(a); *see also Booker*, 543 U.S. at 264–65.[21]

Under Section 3553(a), sentencing courts must weigh a number of considerations, including (i) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (ii) "the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense[,] (B) to afford adequate deterrence to criminal conduct[,] (C) to protect the public from further crimes of the defendant[,] and (D) to provide the defendant with needed [rehabilitation]"; and (iii) "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct[.]"  18 U.S.C. § 3553(a).[22]

---

[21] A "variance" refers to a sentence outside of the recommended Guidelines range "based on the applicable factors in 18 U.S.C. § 3553(a) taken as a whole."  *United States v. Murray*, 897 F.3d 298, 308 n.8 (D.C. Cir. 2018).  That is different from a "departure[,]" which refers to a sentence outside of the recommended Guidelines range based on factors specified in the Sentencing Guidelines themselves.  *Id.*

[22] Section 3553(a) states:

The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.  The court, in determining the particular sentence to be imposed, shall consider—
(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;
(2)  the need for the sentence imposed—

A sentencing court "may not presume that the Guidelines range is reasonable." *Gall*, 552 U.S. at 50. Rather, the court "must make an individualized assessment based on the facts presented." *Id.* And if the court "decides that an outside-Guidelines sentence is warranted," it "must give serious consideration" to "the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* at 46, 50. After all, while not binding, the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Id.* at 46.

---

     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

     (B) to afford adequate deterrence to criminal conduct;

     (C) to protect the public from further crimes of the defendant; and

     (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

  (3) the kinds of sentences available;

  (4) the kinds of sentence and the sentencing range established for … the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines … issued by the Sentencing Commission …;

  (5) any pertinent policy statement … issued by the Sentencing Commission …[;]

  (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and

  (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Sentencing decisions can be reviewed for both procedural errors and their "substantive reasonableness." *Gall*, 552 U.S. at 51. In this case, the government does not dispute the procedural propriety of the district court's approach. It challenges only the substantive reasonableness of Khatallah's sentence.

We review the substantive reasonableness of a sentence for abuse of discretion. *See Gall*, 552 U.S. at 51. In doing so, we must "take into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Id.* A reviewing court "must give due deference to the district court's decision that the [Section] 3553(a) factors … justify the extent of the variance." *Id.* At the same time, the court must ensure that the district court has explained its conclusion "that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications." *Id.* at 46.

**B**

**1**

The district court properly started its sentencing judgment by calculating Khatallah's Sentencing Guidelines range. Because Khatallah's Section 924(c) firearms conviction carried a statutorily mandated minimum sentence of ten years (and a maximum of life), the Guidelines determination focused on the remaining counts of conviction—that is, the convictions for conspiring to provide material support to terrorists, 18 U.S.C. § 2339A, providing such support, *id.*, and maliciously destroying or injuring property within the special maritime and territorial jurisdiction of the United States, 18 U.S.C. § 1363.

In computing the Guidelines range for those three offenses, the district court recognized that its analysis was not limited to

facts that the jury found, but could include any "relevant conduct." U.S.S.G. § 1B1.3.[23]  While the jury, applying the beyond-a-reasonable-doubt standard, made a specific finding that Khatallah's actions did not result in death, the district court found by a preponderance of the evidence that Khatallah's relevant conduct had led to death.  *See Khatallah V*, 314 F. Supp. at 190.  The court reasoned that it was "more likely than not that [Khatallah] agreed with several other participants to launch an armed attack on the Mission, and the attack foreseeably resulted in deaths that furthered the ends of the conspiracy."  *Id.*  For that reason, the district court determined that Khatallah's base offense level for the two terrorism support counts, together with the property count, was 38, applying the Guideline for second-degree murder, U.S.S.G. § 2A1.2(a).  The district court also found that Khatallah's initial criminal history category was Category I.

The court next applied sentencing enhancements for terrorism and Khatallah's leadership role.  The Sentencing Guidelines call for a twelve-level increase in offense level and an automatic bump to criminal history Category VI if "the offense is a felony that involved, or was intended to promote, a

---

[23]  "Relevant conduct" is broadly defined in the Sentencing Guidelines to include "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," and in the case of "jointly undertaken criminal activity[,]" also "all acts and omissions of others that were—(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity[.]"  U.S.S.G. § 1B1.3(a)(1).  Relevant conduct also sweeps in "all harm that resulted from" or "was the object of" those acts and omissions.  *Id.* § 1B1.3(a)(3).

federal crime of terrorism[,]" U.S.S.G. § 3A1.4(a), (b), defined as an offense falling within an enumerated list that is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct[,]" 18 U.S.C. § 2332b(g)(5). The Guidelines' leadership enhancement separately calls for a four-level increase in the offense level if "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive[.]" U.S.S.G. § 3B1.1(a).

In applying the terrorism enhancement, the district court found that Khatallah's conduct was "more likely than not 'intended to promote' a crime calculated to retaliate against the U.S. government or to shape its policy." *Khatallah V*, 314 F. Supp. 3d at 199 (quoting U.S.S.G. § 3A1.4). The court pointed to both "the very choice of target for the attack[,]" *id.* at 198, and testimony showing that Khatallah had "expressed frustration about the United States spying on Libyans and Muslims in Benghazi[,]" and had "described the United States of America as the cause of all the world's problems[,]" *id.* at 199 (internal quotation marks and citations omitted).

As for the leadership enhancement, the district court found that Khatallah organized or led the attack on the Mission. The court relied on evidence showing that Khatallah procured weapons before the attack and instructed others during the attack, as well as testimony suggesting that he "sat atop the structure of" the militant group UBJ. *Khatallah V*, 314 F. Supp. 3d at 200. The court also pointed to evidence introduced at the sentencing stage from a Libyan student who told the government that he had taken a picture of several men, including Khatallah, in a truck outside the Mission on the night of the attack, after which Khatallah instructed other men to detain him.

Based on those findings, the district court concluded that the Guidelines sentence for the two support-of-terrorism convictions, along with the property-destruction conviction, was life imprisonment. The Section 924(c) count carried a statutory minimum of ten years to run consecutively to any other sentence, so Khatallah's advisory Guidelines sentence for all counts of conviction was life in prison plus ten years. The government agrees with the district court's calculation of that Sentencing Guidelines range.

**2**

In its sentencing memorandum, the government asked for the maximum sentence permissible under the law, which was life plus fifty years—life in prison being the maximum authorized under Section 924(c) and fifty years being the combined statutory maximum sentences for the other three offenses. Khatallah urged the court to impose a sentence between 51 and 63 months for the property damage and support of terrorism counts, and only the ten-year mandatory minimum on the Section 924(c) count.

At the sentencing hearing, the court affirmed that it had considered all of the Section 3553(a) factors and proceeded "to highlight" what it considered to be "a few of the most relevant factors[.]" Sentencing Tr. 52 (June 27, 2018). The "most important" factor for the district court was the "jury's acquittals[,]" without which it would have been "an easy sentencing[.]" *Id.* at 56–57. The court recounted that the jury had returned "[f]our convictions[,] all related to the destruction of a building at the Mission[,] and 14 acquittals and a specific finding that [Khatallah's] conduct did not result in anyone's death." *Id.* at 58. The court noted that it had considered acquitted conduct in calculating the Guidelines range. *See id.* at 52–53. But the court stressed that the "[twelve] jurors and

the three alternates … who sacrificed seven weeks" to hear the evidence and arguments and thoroughly deliberate each charge would likely be "shocked to learn that" Khatallah could be sentenced on the basis of conduct that they determined the government had not proven beyond a reasonable doubt. *Id.* at 59. In the district court's view, increasing Khatallah's sentence based on evidence the jury rejected would undermine "the fundamental purpose of the Sixth Amendment jury trial right, which is to ensure that before the government deprives someone of liberty it [has] persuade[d] a jury that it has proven each element of the crime charged beyond a reasonable doubt." *Id.*

Parsing the jury's verdict, the court concluded that it "could rely solely on facts that the jury did not necessarily reject to apply both the leadership and the terrorism enhancement … [which] would result in a life sentence." Sentencing Tr. 60 (June 27, 2018). "But stepping back a minute," the court stated that it was "clear enough … that the jury explicitly found that [Khatallah's] conduct did not result in death, that it rejected many of the facts presented that tied [Khatallah] to direct participation in the first wave of the attacks and to the attack on the Annex, and that what it convicted him of was essentially a property crime." *Id.* "[I]n light of those findings," the district court came, "somewhat reluctantly, to the conclusion that a life sentence overestimate[d] [Khatallah's] criminal conduct and culpability as it was determined by the jury." *Id.* at 60–61.

The court then varied downward from the Guidelines range of life imprisonment to impose a sentence of just twelve years for each of the three counts of property damage and support of terrorism, to run concurrently, plus the mandatory minimum of ten years on the Section 924(c) count, to run consecutively as required by law. That left Khatallah with a total sentence of 22 years.

## C

This court has long left open the question of whether district courts are permitted to vary downward in order to avoid sentencing defendants on the basis of acquitted conduct. *See United States v. Settles*, 530 F.3d 920, 923–24 (D.C. Cir. 2008); *see also United States v. Bell*, 808 F.3d 926, 928 (D.C. Cir. 2015) (Kavanaugh, J., concurring in the denial of rehearing en banc) ("[E]ven in the absence of a change of course by the Supreme Court, … federal district judges have power in individual cases to disclaim reliance on acquitted … conduct."). We need not decide that question today because the government has conceded the point.

The problem is that the district court's sentence went far lower than discounting acquitted conduct alone could support when it imposed a total sentence of just twelve years for the terrorism-support and property-destruction convictions. Given the gap between the acquitted-conduct reduction and the twelve-year sentence imposed, the district court needed to provide reasons justifying the further steep reduction in Khatallah's sentence. Because the district court did not do so—and could not have done so on this record—we reverse the sentence and remand for a new sentencing.

## 1

According to the government, after setting aside acquitted conduct, Khatallah's Guidelines range would have been 30 years to life. *See* S.A. 104; Sentencing Tr. 24 (June 27, 2018); Gov't Opening Br. 83 & n.7. It arrived at that range by decreasing the base offense level from 38 to 24 to account for the jury's acquittals on all charges involving death, while also retaining the terrorism and leadership enhancements that the district court acknowledged could be applied without reference to acquitted conduct.

Khatallah disagrees, arguing that the Guidelines range without acquitted conduct would also exclude the terrorism and leadership enhancements. He reasons that, "while the district court concluded that it '*could* rely solely on facts that the jury did not *necessarily* reject to apply both the leadership and the terrorism enhancement,' … [it] may have concluded that the jury *actually* rejected the facts necessary for those enhancements." Khatallah Reply Br. 54 (emphases in original) (citation omitted).

But Khatallah was not "acquitted" for conduct unless the jury necessarily determined that the facts underlying a charge or enhancement were not proved beyond a reasonable doubt. On this record, we agree with the district court that "the jury did not necessarily reject" the facts underlying the terrorism and leadership enhancements. Sentencing Tr. 60 (June 27, 2018). That is because three of the crimes of which the jury *did* convict Khatallah—conspiring to provide material support to terrorists, providing such support, and destruction of government property—are themselves qualifying offenses in the definition of "[f]ederal crime of terrorism." 18 U.S.C. § 2332b(g)(5)(B)(i). More specifically, the conduct underlying those offenses could support a finding that Khatallah intended "to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *Id.* § 2332b(g)(5)(A). So too the jury's acquittal of Khatallah for the deaths that occurred in no way precluded the jury from simultaneously concluding that Khatallah was "an organizer or leader" of some aspect of the attack. U.S.S.G. § 3B1.1(a). After all, much of the evidence that supported the jury's convictions pointed to Khatallah's role as an organizer of at least part of the attack on the Mission.

In short, the jury did not *acquit* Khatallah of the conduct that would support application of the terrorism and leadership

enhancements. Instead, its verdicts are consistent with a finding that Khatallah undertook conduct that would support those enhancements. As such, the district court did not need to exclude those enhancements to calculate what the Guidelines range would be in the absence of acquitted conduct. Because Khatallah does not otherwise dispute the government's calculation, we take as given that the Guidelines range would have been 30 years to life even without relying on acquitted conduct.

Khatallah asserts that considering the Guidelines range that would have applied without acquitted conduct places "undue emphasis" on the Guidelines. Khatallah Reply Br. 55. That is incorrect. While the Guidelines are no longer mandatory, they "remain the starting point and the initial benchmark for sentencing, … [and] thus continue to guide district courts in exercising their discretion by serving as the framework for sentencing[.]" *Beckles v. United States*, 137 S. Ct. 886, 894 (2017) (internal quotation marks and citation omitted). As a result, the sentence that the Guidelines would deem appropriate after subtracting out the conduct for which Khatallah was acquitted remains a relevant consideration in assessing whether the district court's variance was justified.

**2**

At bottom, the district court's rationale for varying downward to just a twelve-year sentence placed more weight on the acquitted-conduct rationale than it could bear.

We note at the outset that neither this court nor the government takes issue with the procedural soundness of the district court's sentencing statement. The district court properly began with the Guidelines sentence, and then carefully and comprehensively considered the key sentencing factors set out in Section 3553(a), including the nature and

seriousness of Khatallah's conduct, Khatallah's particular characteristics and history, and the need for general and specific deterrence.

The problem, instead, is that after analyzing the Section 3553(a) factors, the district court stated that "this would be an easy sentencing but for the final factor, … the jury's acquittals[.]" Sentencing Tr. 56–57 (June 27, 2018). This statement strongly implies that the other Section 3553(a) factors were a wash, and but for the jury's acquittals, the district court would have sentenced Khatallah consistent with the Guidelines' recommendation of a life sentence. To that same point, immediately after analyzing the effect of the jury's acquittals, the district court explained that, "in light of those findings, I have come, somewhat reluctantly, to the conclusion that a life sentence overestimates the defendant's criminal conduct and culpability as it was determined by the jury." *Id.* at 60–61. That leaves unexplained the basis on which the court varied downward from a 30-year sentence—the bottom of the Guidelines range once acquitted conduct is set aside—to just twelve years for the three support-of-terrorism and property counts. An unexplained variance is a substantively unreasonable variance.

But even if the district court also placed weight on Section 3553(a) factors besides the acquittals in choosing a twelve-year sentence, those other factors are inadequate to support such a steep additional variance. Every factor discussed by the district court other than acquitted conduct either supported imposition of a sentence within the Guidelines range or was a mixed bag.

First, the district court's treatment of the nature and the seriousness of the defendant's conduct cannot support a sentence so much more lenient than the applicable Guidelines range even without considering acquitted conduct. The court

remarked that it "did not believe that [Khatallah was] an innocent bystander on the night of September 11, 2012[,]" or that he "learned for the first time that there was a U.S. facility in Benghazi that night." Sentencing Tr. 53 (June 27, 2018). The court, in fact, found "at the very least" that Khatallah (i) "drove some of [his] men to the Mission" the night of the attack, (ii) was "in telephone contact with several of them before, during, and after" the attack, (iii) "appeared on camera, armed, entering a Mission building while it was being ransacked," and (iv) "drove several of [his men] away to the camp of another extremist group after the attack." *Id.* at 54. On that basis, the district court concluded that Khatallah's conduct was "gravely serious" because, "even if [he] did [not] pour the gasoline or light the match, … the evidence showed that [he was] aware of the attack, and that once those gates were breached the likelihood of someone dying was extremely high." *Id.* at 54–55. So to characterize a terrorist attack on a diplomatic outpost as "essentially a property crime" warranting a significantly below-Guidelines sentence both was inconsistent with the district court's own findings as to the seriousness of Khatallah's actions and failed to account for the two support-of-terrorism convictions. *Id.* at 60. Given the gravity of Khatallah's terrorism-support and Mission-destruction convictions, the court's twelve-year sentence for those counts was "shockingly low and unsupportable as a matter of law" on this record. *United States v. Mumuni*, 946 F.3d 97, 108 (2d Cir. 2019).

Second, the district court's discussion of Khatallah's individual characteristics and history offered scant support for an additional 60% downward variance from the Guidelines range. On one hand, the judge stated that he "appreciate[d] the attention and the respect that [Khatallah had] given to these proceedings," and opined that, based on the video testimonials submitted to the court, Khatallah "seem[ed] to be a hard-

working and resourceful guy" with "a supportive family." Sentencing Tr. 55–56 (June 27, 2018). Yet, even assuming that paying attention and being respectful in court are relevant Section 3553(a) factors, the district court also told Khatallah that "you strike me as a creature of [a violent] culture; perhaps not [a] stone-cold premediated terrorist …, but someone who might readily resort to or order violence in furtherance of whatever ideological or political goals you might have." *Id.* at 55; *see id.* (district court finding that Khatallah "spent [his] entire adult life in a culture of violence, oppression by the Gaddafi regime, imprisonment in brutal conditions, armed conflict during the revolution and … civil war after the revolution"). Those crosscutting statements regarding Khatallah's characteristics and history could not justify a lower sentence, let alone the extensive additional variance taken here.

Third, the district court was similarly equivocal in its analysis of the need for general and specific deterrence. The court began by declaring that "anyone intent on doing … harm" to United States persons stationed abroad "must know that there will be consequences[,]" and "that they will be apprehended, prosecuted, and given *stiff* sentences, if they are convicted." Sentencing Tr. 56 (June 27, 2018) (emphasis added). At the same time, the court stated that it had "no reason to doubt" that offenders like Khatallah "are less and less likely to reoffend as they get older[.]" *Id.* And it "doubt[ed]" that Khatallah "would have the means or the opportunity to harm America again[.]" *Id.* But it added that "certainly there's no guarantee of that." *Id.*

Those findings cannot support the variance that occurred here—or any downward variance at all. Quite the opposite, the district court's own analysis of the deterrence interests at stake acknowledged that they support a stiffer, not a lower, sentence. As the court noted, those contemplating attacks on the United

States, its official properties, and (most importantly) its personnel must know they will face severe consequences if apprehended and convicted. Their leaders even more so. The district court's variance down to a twelve-year sentence did not match its own deterrence concerns. Nor could such a variance be warranted on this record given the gravity of Khatallah's convictions.

At bottom, on this record, the district court's discussion of the Section 3553(a) factors was insufficient to justify a sentence substantially below the bottom of the Guidelines range that would have applied even in the absence of acquitted conduct. As the reviewing court, it is our responsibility to ensure that "an unusually lenient" sentence is supported "with sufficient justifications." *Gall*, 552 U.S. at 46. And it is "uncontroversial that a major departure should be supported by a more significant justification than a minor one." *Id.* at 50. A decrease from a 30-years-to-life Guidelines range to just twelve years is unquestionably a "major departure." *Id.* Even assuming that the district court's consideration of the jury's acquittals justified a departure down to thirty years, a further variance to less than half of that is itself significant and requires independent justification. Yet the district court did not offer a discussion of sentencing factors besides the jury's acquittals that was "sufficiently compelling to support the degree of the variance." *Id.* Nor could it have, given the facts of this case and the gravity of Khatallah's terrorism offenses and leadership role in a violent attack on the Mission.

**D**

In sum, while the district court's discretion to vary downward to discount acquitted conduct is undisputed in this case, the district court abused its discretion by varying downward significantly further and imposing a sentence both

lower than the minimum that would be appropriate in light of the jury's acquittals and far lower than could be justified on this record by reference to the Section 3553(a) factors. For that reason, on the government's cross appeal, we reverse and remand for resentencing.

## VII

The judgment of the district court is affirmed in part and reversed in part. The case is remanded for resentencing.

*So ordered.*

MILLETT, *Circuit Judge*, concurring: While I join the court's opinion in full, I write separately with respect to the district court's sentencing decision to reconfirm what then-Judge Kavanaugh and others have said: District courts are permitted, in the exercise of their sentencing discretion, to do what the district court did here—to vary downward to ensure that a sentence is not predicated on acquitted conduct. *See United States v. Bell*, 808 F.3d 926, 927–928 (D.C. Cir. 2015) (Kavanaugh, J., concurring in the denial of rehearing en banc). I have written separately before to explain why sentencing a defendant to a longer period of incarceration based on conduct of which he was *acquitted* by a jury is a "grave constitutional wrong." *United States v. Brown*, 892 F.3d 385, 409 (D.C. Cir. 2018) (Millett, J., concurring); *see also Bell*, 808 F.3d at 928–932 (Millett, J., concurring in the denial of rehearing en banc); *United States v. Bagcho*, 923 F.3d 1131, 1141 (D.C. Cir. 2019) (Millett, J., concurring). I continue to adhere to that view.

But the question before us today is much more modest: May district courts choose not to consider acquitted conduct if they determine that doing so would be inconsistent with their responsibility to impose a just and reasonable sentence under 18 U.S.C. § 3553(a)? I agree wholeheartedly with Judge Kavanaugh that district courts have that authority.

To be sure, for now, Supreme Court and circuit precedent "do[] not *prevent* the sentencing court from considering conduct underlying [an] acquitted charge[.]" *United States v. Watts*, 519 U.S. 148, 157 (1997) (per curiam) (emphasis added); *United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) (Kavanaugh, J.). But nothing in binding precedent has ever *required* district courts to factor in such conduct when determining an appropriate sentence. *See Settles*, 530 F.3d at 923–924; *cf. United States v. White*, 551 F.3d 381, 386 (6th Cir. 2008) (en banc) ("To say that district court judges may enhance a defendant's sentence based on acquitted conduct * * * is not to say that they *must* do so.").

To the contrary, we have long left open the possibility that district courts may "discount acquitted conduct in particular cases—that is, to vary downward from the advisory Guidelines range when the district judges do not find the use of acquitted conduct appropriate." *Settles*, 530 F.3d at 924; *see Bell*, 808 F.3d at 928 (Kavanaugh, J., concurring in the denial of rehearing en banc) ("[F]ederal district judges have power in individual cases to disclaim reliance on acquitted * * * conduct."). And the government, for its part, agrees that "the district court was permitted to vary downward to avoid sentencing Khatallah based on acquitted conduct[.]" Gov't Reply Br. 4; *see also* Gov't Reply Br. 20; Oral Arg. Tr. 57:8–10 ("[Y]ou don't dispute the District Court's authority to vary down to avoid taking account of acquitted conduct." "That's correct.").

So there is no barrier to a district court varying downward in a manner that discounts acquitted conduct if it determines that doing so appropriately "reflect[s] the seriousness" or "nature and circumstances of the offense[,]" "provide[s] just punishment for the offense[,]" "promote[s] respect for the law," or otherwise gives effect to the Section 3553(a) factors. 18 U.S.C. § 3553(a)(1), (a)(2)(A).

Here, the district court took heed of Judge Kavanaugh's suggestion in *Bell* and varied downward "to avoid reliance on acquitted conduct" in sentencing Khatallah. Sentencing Tr. 59:18–60:3 (June 27, 2018). And the court did so in a thoughtful and carefully explained manner. *See id.* at 60:4–61:1. Recall that the base offense level used in the Sentencing Guidelines calculations was that for second-degree murder because, in calculating the Guidelines range, the district court found by a preponderance of the evidence that "death resulted, or the offense was intended to cause death or serious bodily injury[.]" U.S.S.G. § 2K1.4(c)(1). The jury, however,

3

acquitted Khatallah of all charges involving death and specifically found Khatallah not guilty of causing death through his material support of terrorism. To "respect * * * the jury's overall verdict and underlying findings[,]" Sentencing Tr. 62:6–7 (June 27, 2018), the district court varied downward to avoid sentencing Khatallah as if the jury had found that his conduct resulted in death. The district court explained that, in its view, "significantly increas[ing] [Khatallah's] sentence based on evidence that [the jury] rejected" would undermine "the importance and the sanctity of jury service, and * * * the fundamental purpose of the Sixth Amendment jury trial right[.]" *Id.* at 59:8–14. After carefully analyzing the jury's split verdict and giving due weight to its explicit finding that Khatallah was not guilty of conduct resulting in death, the district court came "to the conclusion that a life sentence [would] overestimate[] [Khatallah's] criminal conduct and culpability as it was determined by the jury." *Id.* at 60:23–61:1.

Of course, I am of the view that district courts not only *can* vary downward to sidestep reliance on acquitted conduct, but that they *should* do so based on bedrock legal principles. "[A]llowing a judge to dramatically increase a defendant's sentence based on jury-acquitted conduct is at war with the fundamental purpose of the Sixth Amendment's jury-trial guarantee[,]" and when a deprivation of liberty is made longer based on facts the jury determined were not proved beyond a reasonable doubt, then that great "liberty-protecting bulwark becomes little more than a speed bump at sentencing." *Bell*, 808 F.3d at 929 (Millett, J., concurring in the denial of rehearing en banc).

I am not alone in that view. "Many judges and commentators have similarly argued that using acquitted conduct to increase a defendant's sentence undermines respect for the law and the jury system." *Settles*, 530 F.3d at 924.

Judge Kavanaugh likewise explained that "[a]llowing judges to rely on acquitted * * * conduct to impose higher sentences than they otherwise would impose seems a dubious infringement of the rights to due process and to a jury trial." *Bell*, 808 F.3d at 928 (Kavanaugh, J., concurring in the denial of rehearing en banc); *see id.* at 927 (remarking that the practice by which a defendant can be acquitted of a crime by a jury of his peers, only to then be sentenced as if he had committed that very crime, is a stubborn "oddit[y] of sentencing law"); *see also Watts*, 519 U.S. at 164 (Stevens, J., dissenting) (describing sentencing based on acquitted conduct as a "perverse result"); *United States v. Baylor*, 97 F.3d 542, 550 (D.C. Cir. 1996) (Wald, J., concurring specially) ("[T]he use of acquitted conduct * * * in computing an offender's sentence leaves such a jagged scar on our constitutional complexion that periodically its presence must be highlighted and reevaluated in the hopes that someone will eventually pay attention[.]"); *United States v. Mateo-Medina*, 845 F.3d 546, 554 (3d Cir. 2017) ("[C]alculating a person's sentence based on crimes for which he or she was not convicted undoubtedly undermines the fairness, integrity, and public reputation of judicial proceedings."); *United States v. Alejandro-Montañez*, 778 F.3d 352, 362–363 (1st Cir. 2015) (Torruella, J., concurring) ("[I]t is inappropriate and constitutionally suspect to enhance a defendant's sentence based on conduct that the defendant was * * * acquitted of."); *United States v. Canania*, 532 F.3d 764, 776 (8th Cir. 2008) (Bright, J., concurring) ("Permitting a judge to impose a sentence that reflects conduct the jury expressly disavowed through a finding of 'not guilty' amounts to more than mere second-guessing of the jury—it entirely trivializes its principal fact-finding function."); *White*, 551 F.3d at 392 (Merritt, J., dissenting) ("[T]he use of acquitted conduct at sentencing defies the Constitution, our common law heritage, the Sentencing Reform Act, and common sense."); *United States v. Faust*, 456 F.3d 1342, 1353 (11th Cir. 2006)

(Barkett, J., specially concurring) (decrying the "pernicious effect of sentencing on the basis of acquitted conduct"); *cf. Jones v. United States*, 574 U.S. 948, 949 (2014) (Scalia, J., joined by Thomas & Ginsburg, JJ., dissenting from denial of certiorari) ("[A]ny fact necessary to prevent a sentence from being substantively unreasonable—thereby exposing the defendant to the longer sentence—is an element that must be either admitted by the defendant or found by the jury.  It *may not* be found by a judge."); *United States v. Sabillon-Umana*, 772 F.3d 1328, 1331 (10th Cir. 2014) (Gorsuch, J.) ("We admit [our premise] * * * assumes that a district judge may either decrease or increase a defendant's sentence (within the statutorily authorized range) based on facts the judge finds without the aid of a jury or the defendant's consent.  It is far from certain whether the Constitution allows at least the second half of that equation.").

While it falls upon the Supreme Court to hold that sentencing defendants based on conduct for which they have been acquitted contravenes the Constitution and to firmly put an end to the practice, it is well within our bailiwick to reaffirm that district courts may vary downward to avoid reliance on acquitted conduct in individual cases.  Granted, trial judges may still be obligated to factor in acquitted conduct when calculating the Guidelines range to the extent it constitutes "relevant conduct[,]" U.S.S.G. § 1B1.3.  *See Bell*, 808 F.3d at 928 (Kavanaugh, J., concurring in the denial of rehearing en banc).  But since those Guidelines are only advisory, there should be no question that "district judges may then vary the sentence downward to avoid basing any part of the ultimate sentence on acquitted * * * conduct[,]" *id.*, and so to ensure a sentence is fair and appropriate as required by 18 U.S.C. § 3553(a).

In sum, the portion of the district court's downward variance designed to avoid reliance on acquitted conduct was a sound and commendable exercise of discretion.  And it set an example that I hope other district court judges will follow to retain and "promote respect for the law," 18 U.S.C. § 3553(a)(2)(A), and to maintain the role of the jury trial as one of the greatest "guard[s] against a spirit of oppression and tyranny on the part of rulers" ever devised, *United States v. Gaudin*, 515 U.S. 506, 510–511 (1995) (citation omitted).